# PHILLIPS PETROLEUM CO. ET AL. *v.* MISSISSIPPI ET AL.

No. 86–870.   Argued November 9, 1987—Decided February 23, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which STEVENS and SCALIA, JJ., joined, *post*, p. 485. KENNEDY, J., took no part in the consideration or decision of the case.

*Eugene Gressman* argued the cause for petitioners. With him on the briefs were *Joel Blass, William G. Paul, John L. Williford,* and *Elizabeth A. Harris.*

*Kathy D. Sones,* Special Assistant Attorney General of Mississippi, argued the cause for respondents. With her on the brief were *Edwin Lloyd Pittman,* Attorney General, *Robert Franklin Spencer,* Assistant Attorney General, and *Jean R. Swift. Charles Ed Harper* and *Boyce Holleman* filed a brief for respondent Saga Petroleum U. S. Inc.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Land Title Association by *Louis F. Claiborne, Edgar B. Washburn,* and *Sean McCarthy;* for the city of Elizabeth, New Jersey, et al. by *John R. Weigel;* and for Robert E. Longino, Jr., by *Robert S. Marsel.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, *N. Gregory Taylor,* Assistant Attorney General, *Jan Stevens,* Supervising Deputy Attorney General, and *Michael L. Crow,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Don Siegelman,* of Alabama, *Grace Berg Schaible,* of Alaska, *Robert K. Corbin,* of Arizona, *Robert A. Butterworth,* of Florida, *Warren Price III,* of Hawaii, *William J. Guste, Jr.,* of Louisiana, *Lacy H. Thornburg,* of North Carolina, *Dave Frohnmayer,* of Oregon, *Jim Mattox,* of Texas, *Kenneth O. Eikenberry,* of Washington; and for the 13 Original States by *David C. Slade,* and by the Attorneys General of their respective States as follows: *Joseph I. Lieberman* of Connecticut, *Charles M. Oberly III* of Delaware, *Michael J. Bowers* of Georgia, *J. Joseph Curran* of Maryland, *James M. Shannon* of Massachusetts, *Stephen E. Merrill* of New Hampshire, *W. Cary Edwards* of New Jersey, *Robert Abrams* of New York, *James G. Martin, Jr.,* of North Carolina, *LeRoy S. Zimmerman* of Pennsylvania,

JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether the State of Mississippi, when it entered the Union in 1817, took title to lands lying under waters that were influenced by the tide running in the Gulf of Mexico, but were not navigable in fact.

I

As the Mississippi Supreme Court eloquently put it: "Though great public interests and neither insignificant nor illegitimate private interests are present and in conflict, this in the end is a title suit." *Cinque Bambini Partnership* v. *State*, 491 So. 2d 508, 510 (1986). More specifically, in question here is ownership of 42 acres of land underlying the north branch of Bayou LaCroix and 11 small drainage streams in southwestern Mississippi; the disputed tracts range from under one-half acre to almost 10 acres in size. Although the waters over these lands lie several miles north of the Mississippi Gulf Coast and are not navigable, they are nonetheless influenced by the tide, because they are adjacent and tributary to the Jourdan River, a navigable stream flowing into the Gulf. The Jourdan, in the area involved here, is affected by the ebb and flow of the tide. Record title to these tracts of land is held by petitioners, who trace their claims back to prestatehood Spanish land grants.

The State of Mississippi, however, claiming that by virtue of the "equal-footing doctrine" it acquired at the time of statehood and held in public trust all land lying under any waters influenced by the tide, whether navigable or not, issued oil and gas leases that included the property at issue. This quiet title suit, brought by petitioners, ensued.

The Mississippi Supreme Court, affirming the Chancery Court with respect to the lands at issue here,[1] held that by

---

*James E. O'Neil* of Rhode Island, *T. Travis Medlock* of South Carolina, and *Mary Sue Terry* of Virginia.

[1] The Chancery Court had held that 140 acres of the lands claimed by petitioners were public trust lands. The Mississippi Supreme Court re-

virtue of becoming a State, Mississippi acquired "fee simple title to all lands naturally subject to tidal influence, inland to today's mean high water mark . . . ." *Ibid.* Petitioners' submission that the State acquired title to only lands under navigable waters was rejected.

We granted certiorari to review the Mississippi Supreme Court's decision, 479 U. S. 1084 (1987), and now affirm the judgment below.

## II

As petitioners recognize, the "seminal case in American public trust jurisprudence is *Shively* v. *Bowlby*, 152 U. S. 1 (1894)." Reply Brief for Petitioners 11. The issue in *Shively* v. *Bowlby*, 152 U. S. 1 (1894), was whether the State of Oregon or a prestatehood grantee from the United States of riparian lands near the mouth of the Columbia River at Astoria, Oregon, owned the soil below the high-water mark. Following an extensive survey of this Court's prior cases, the English common law, and various cases from the state courts, the Court concluded:

> "At common law, the title and dominion in lands flowed by the tide water were in the King for the benefit of the nation. . . . Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders, subject to

versed with respect to 98 of these 140 acres, finding that these tracts were artificially created tidelands (caused by road construction), and therefore were not part of the public trust created in 1817. Since these lands were neither tidelands in 1817, nor were they added to the tidelands by virtue of natural forces of accretion, they belonged to their record titleholders. 491 So. 2d, at 520.

Because the State did not cross-petition, this portion of the Mississippi Supreme Court's decision is not before us. The only issue presented here is title to the 42 acres which the Mississippi Supreme Court found to be public trust lands.

the rights surrendered by the Constitution of the United States.

.        .        .        .        .

"The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions." *Id.*, at 57.

*Shively* rested on prior decisions of this Court, which had included similar, sweeping statements of States' dominion over lands beneath tidal waters. *Knight* v. *United States Land Association*, 142 U. S. 161, 183 (1891), for example, had stated that "[i]t is the settled rule of law in this court that absolute property in, and dominion and sovereignty over, the soils under the tide waters in the original States were reserved to the several States, and that the new States since admitted have the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders." On many occasions, before and since, this Court has stated or restated these words from *Knight* and *Shively*.[2]

Against this array of cases, it is not surprising that Mississippi claims ownership of all of the tidelands in the State. Other States have done as much.[3] The 13 original States,

---

[2] *E. g.*, *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10, 15 (1935); *Appleby* v. *City of New York*, 271 U. S. 364, 381 (1926); *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 435 (1892); *Hardin* v. *Jordan*, 140 U. S. 371, 381 (1891); *McCready* v. *Virginia*, 94 U. S. 391, 394 (1877); *Weber* v. *Harbor Comm'rs*, 18 Wall. 57, 65 (1873); *Goodtitle* v. *Kibbe*, 9 How. 471, 477–478 (1850).

[3] See, *e. g.*, *Wright* v. *Seymour*, 69 Cal. 122, 123–127, 10 P. 323, 324–326 (1886), which held that the State of California owned the bottom of the Russian River as far as the tide affected it, even where the River was not navigable in fact.

Earlier, the Connecticut Supreme Court had held that the tidal flats adjoining an arm of the sea were in public ownership. *Simons* v. *French*, 25 Conn. 346, 352–353 (1856). The South Carolina Supreme Court reached a similar conclusion concerning "salt marshes." *State* v. *Pinckney*, 22 S. C.

joined by the Coastal States Organization (representing all coastal States), have filed a brief in support of Mississippi, insisting that ownership of thousands of acres of tidelands under nonnavigable waters would not be disturbed if the judgment below were affirmed, as it would be if petitioners' navigability-in-fact test were adopted. See Brief for 13 Original States as *Amici Curiae* 3–5, 26–27.

Petitioners rely on early state cases to indicate that the original States did not claim title to nonnavigable tidal waters. See Brief for Petitioners 23–29. But it has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit. *Shively* v. *Bowlby, supra,* at 26. Some of the original States, for example, did recognize more private interests in tidelands than did others of the 13—more private interests than were recognized at common law, or in the dictates of our public trusts cases. See n. 12, *infra*. Because some of the cases which petitioners cite come from such States (*i. e.,* from States which abandoned the common law with respect to tidelands),[4] they are of only limited value in understanding

---

484, 507–509 (1885). Both of these cases, and many others like them, recognize state dominion over lands beneath nonnavigable tidal waters.

[4] See, *e. g., Rowe* v. *Granite Bridge Corp.,* 38 Mass. 344, 347 (1838); *Commonwealth* v. *Charlestown,* 18 Mass. 180, 185–186 (1822). Massachusetts abrogated the common law for tidelands in 1641. See *Shively* v. *Bowlby,* 152 U. S. 1, 18–19 (1894); *Storer* v. *Freeman,* 6 Mass. 435, 437–439 (1810).

Petitioners also rely quite heavily on two Connecticut cases, *Groton* v. *Hurlburt,* 22 Conn. 178, 185 (1852), and *Wethersfield* v. *Humphrey,* 20 Conn. 218, 227 (1850). See Brief for Petitioners 27. However, we think these cases are inapposite. *Groton* merely held that the erection of a highway over a tidally influenced, but not commercially navigable, creek did not offend federal control over navigable waterways (and did not require a special grant of power under state law). 22 Conn., at 185–189. The decision's interest in the navigability of the creek, therefore, is unremarkable. Moreover, the *Groton* decision noted that construction of the highway put the lands to a publicly beneficial use, and that any navigation of the creek

the public trust doctrine and its scope in those States which have not relinquished their claims to all lands beneath tidal waters.

Finally, we note that several of our prior decisions have recognized that the States have interests in lands beneath tidal waters which have nothing to do with navigation. For example, this Court has previously observed that public trust lands may be used for fishing—for both "shell-fish [and] floating fish." See, e. g., Smith v. Maryland, 18 How. 71, 75 (1855). On several occasions the Court has recognized that lands beneath tidal waters may be reclaimed to create land for urban expansion. E. g., Hardin v. Jordan, 140 U. S. 371, 381–382 (1891); Den v. Jersey Co., 15 How. 426, 432 (1854). Because of the State's ownership of tidelands, restrictions on the planting and harvesting of oysters there have been upheld. McCready v. Virginia, 94 U. S. 391, 395–397 (1877).[5] It would be odd to acknowledge such diverse uses of public trust tidelands, and then suggest that the sole measure of the expanse of such lands is the navigability of the waters over them.

Consequently, we reaffirm our longstanding precedents which hold that the States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide. Under the well-established principles of our cases, the decision of the Mississippi Supreme Court is clearly correct: the lands at issue here are "under tidewaters," and therefore passed to the State of Mississippi upon its entrance into the Union.

## III

Petitioners do not deny that broad statements of public trust dominion over tidelands have been included in this

---

(by small boats or skiffs) was not impaired by the construction. Id., at 187–189. The decision in Wethersfield involved similar considerations. 20 Conn., at 227.

[5] These cases lead us to reject the dissent's assertion that "the fundamental purpose of the public trust is to protect commerce," post, at 488.

Court's opinions since the early 19th century.[6] Rather, they advance two reasons why these previous statements of the public trust doctrine should not be given their apparent application in this case.

A

First, petitioners contend that these sweeping statements of state dominion over tidelands arise from an oddity of the common law, or more specifically, of English geography. Petitioners submit that in England practically all navigable rivers are influenced by the tide. Brief for Petitioners 19. See *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 454 (1852). Thus, "tidewater" and "navigability" were synonyms at common law. See *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 436 (1892). Consequently, in petitioners' view, the Crown's ownership of lands beneath tidewaters actually rested on the navigability of those waters rather than the ebb and flow of the tide. Cf. *ibid.* English authority and commentators are cited to show that the Crown did not own the soil under any nonnavigable waters.[7] Petition-

---

[6] We reject petitioners' contention that our cases concerning "tidelands" are not applicable here because the term "tidelands" includes only shorelands or those lands beneath tidal waters which are immediately adjacent to the sea. Reply Brief for Petitioners 14–17. We find no basis for petitioners' restriction of this term from its more common meaning, *i. e.*, that "tidelands" are lands "over which the tide ebbs and flows . . . land as is affected by the tide." Black's Law Dictionary 1329 (5th ed. 1979).

Furthermore, we note that this Court previously rejected a similar contention almost a century ago. See *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 278, 283 (1894).

[7] See Brief for Petitioners 19–22 (citing, *e. g.*, *Mayor of Lynn* v. *Turner*, 1 Cowp. 86, 98 Eng. Rep. 980, 981 (K. B. 1774); M. Hale, De Jure Maris et Brachiorum ejusdem, cap. iii (1667), reprinted in R. Hall, Essay on the Rights of the Crown and the Privileges of the Subject in the Sea Shores of the Realm, App. v (2d ed. 1875).

As we note in the text, *infra*, at 478, we do not intend to get involved in the historical debate over what the English common law was with respect to nonnavigable tidal streams, if any such law existed—our concern is with how that law was understood and applied by this Court in its cases.

ers also cite for support statements from this Court's opinions, such as *The Genesee Chief, supra,* and *Martin* v. *Waddell,* 16 Pet. 367, 413–414 (1842), which observed that it was "the *navigable* waters of England, and the soils under them, [which were] held by the Crown" at common law (emphasis added).

The cases relied on by petitioners, however, did not deal with tidal, nonnavigable waters. And we will not now enter the debate on what the English law *was* with respect to the land under such waters, for it is perfectly clear how this Court understood the common law of royal ownership, and what the Court considered the rights of the original and the later entering States to be. As we discuss above, this Court has consistently interpreted the common law as providing that the lands beneath waters under tidal influence were given States upon their admission into the Union. See *Shively* v. *Bowlby,* 152 U. S., at 57. See also cases cited in n. 2, *supra.* It is true that none of these cases actually dealt with lands such as those involved in this case, but it has never been suggested in any of this Court's prior decisions that the many statements included therein—to the effect that the States owned all the soil beneath waters affected by the tide—were anything less than an accurate description of the governing law.

## B

Petitioners, in a related argument, contend that even if the common law does not support their position, subsequent cases from this Court developing the *American* public trust doctrine make it clear that navigability—and not tidal influence—has become the *sine qua non* of the public trust interest in tidelands in this country.

It is true that *The Genesee Chief, supra,* at 456–457, overruled prior cases of this Court which had limited admiralty jurisdiction to waters subject to tidal influence. Cf. *The Thomas Jefferson,* 10 Wheat. 428, 429 (1825). The Court did sharply criticize the "ebb and flow" measure of admiralty

inherited from England in *The Genesee Chief*, and instead insisted quite emphatically that the different topography of America—in particular, our "thousands of miles of public navigable water[s] . . . in which there is no tide"—required that "jurisdiction [be] made to depend upon the navigable character of the water, and not upon the ebb and flow of the tide." 12 How., at 457. Later, it came to be recognized as the "settled law of this country" that the lands under navigable freshwater lakes and rivers were within the public trust given the new States upon their entry into the Union, subject to the federal navigation easement and the power of Congress to control navigation on those streams under the Commerce Clause. *Barney* v. *Keokuk*, 94 U. S. 324, 338 (1877). See also *Illinois Central R. Co.* v. *Illinois, supra,* at 435–436.

That States own freshwater river bottoms as far as the rivers are navigable, however, does not indicate that navigability is or was the prevailing test for state dominion over tidelands. Rather, this rule represents the American decision to depart from what it understood to be the English rule limiting Crown ownership to the soil under tidal waters. In *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.,* 429 U. S. 363, 374 (1977), after recognizing the accepted doctrine that States coming into the Union had title to all lands under the tidewaters, the Court stated that *Barney* v. *Keokuk, supra,* had "extended the doctrine to waters which were nontidal but nevertheless navigable, consistent with [the Court's] earlier extension of admiralty jurisdiction."

This Court's decisions in *The Genesee Chief* and *Barney* v. *Keokuk* extended admiralty jurisdiction and public trust doctrine to navigable freshwaters and the lands beneath them. But we do not read those cases as simultaneously withdrawing from public trust coverage those lands which had been consistently recognized in this Court's cases as being within that doctrine's scope: *all* lands beneath waters influenced by

the ebb and flow of the tide. See *Mann* v. *Tacoma Land Co.*, 153 U. S. 273 (1894).[8]

## C

Finally, we observe that not the least of the difficulties with petitioners' position is their concession that the States own the tidelands bordering the oceans, bays, and estuaries — even where these areas by no means could be considered navigable, as is always the case near the shore. Tr. of Oral Arg. 6. It is obvious that these waters are part of the sea, and the lands beneath them are state property; ultimately, though, the only proof of this fact can be that the waters are influenced by the ebb and flow of the tide. This is undoubtedly why the ebb-and-flow test has been the measure of public ownership of tidelands for so long.

---

[8] *Mann* appears to be the only previous case from this Court concerning lands beneath nonnavigable, tidal waters. In *Mann*, the lands at issue were "tide-flats" or "mud flats" located about one mile from the shore of Commencement Bay "covered to a uniform depth of from two to four feet (according to the run of the tides) at high water, and . . . entirely bare at low water." See Appellant's Motion to Advance in *Mann* v. *Tacoma Land Co.*, O. T. 1893, No. 375, pp. 1–2.

Appellant contended in *Mann*, much as petitioners argue here, that while the ebb-and-flow test may have been the measure of sovereign ownership at English common law, "the [American] courts have, by the adoption of the rule of 'navigability in fact' as the test of 'navigability in law,' discarded the common law . . . [and held that w]here there is no navigation in fact, there is no State ownership by virtue of sovereignty." Supplementary Brief for Appellant 41. See also *Mann*, 153 U. S., at 277–279. Appellee, like respondents here, argued that cases such as *Barney* v. *Keokuk* extended the public trust doctrine to cover navigable-in-fact freshwaters, without reducing the scope of the public trust in tidelands. Brief for Appellee 2–4.

The Court, without commenting on the fact that the lands in question were beneath nonnavigable tidal waters, held the lands to be within the public trust, and within the scope of its earlier decision in *Shively*. *Mann*, *supra*, at 283. Thus, the Court implicitly rejected the argument being advanced by petitioners here: that navigability in fact determined the scope of public trust tidelands.

Admittedly, there is a difference in degree between the waters in this case, and nonnavigable waters on the seashore that are affected by the tide. But there is no difference in kind. For in the end, all tidewaters are connected to the sea: the waters in this case, for example, by a navigable, tidal river. Perhaps the lands at issue here differ in some ways from tidelands directly adjacent to the sea; nonetheless, they still share those "geographical, chemical and environmental" qualities that make lands beneath tidal waters unique. Cf. *Kaiser Aetna* v. *United States*, 444 U. S. 164, 183 (1979) (BLACKMUN, J., dissenting).

Indeed, we find the various alternatives for delineating the boundaries of public trust tidelands offered by petitioners and their supporting *amici* to be unpersuasive and unsatisfactory.[9] As the State suggested at argument, see Tr. of Oral Arg. 22–23, and as recognized on several previous occasions, the ebb-and-flow rule has the benefit of "uniformity and certainty, and . . . eas[e] of application." See, *e. g.*, *Cobb* v. *Davenport*, 32 N. J. L. 369, 379 (1867). We are unwilling, after its lengthy history at common law, in this Court, and in many state courts, to abandon the ebb-and-flow rule now, and seek to fashion a new test to govern the limits of public trust tidelands. Consequently, we hold that the lands at issue in this case were within those given to Mississippi when the State was admitted to the Union.

## IV

Petitioners in passing, and *amici* in somewhat greater detail, complain that the Mississippi Supreme Court's decision is "inequitable" and would upset "various . . . kinds of property expectations and interests [which] have matured since Mississippi joined the Union in 1817."[10] They claim

---

[9] See, *e. g.*, Tr. of Oral Arg. 6–7; Brief for American Land Title Association as *Amicus Curiae* 6–7, and n. 4.

[10] Brief for Petitioners 37. See also Tr. of Oral Arg. 31–32; Brief for City of Elizabeth, New Jersey, et al. as *Amici Curiae* 17–20; Brief for American Land Title Association as *Amicus Curiae* 1–3.

that they have developed reasonable expectations based on their record title for these lands, and that they (and their predecessors-in-interest) have paid taxes on these lands for more than a century.

We have recognized the importance of honoring reasonable expectations in property interests. Cf. *Kaiser Aetna* v. *United States, supra,* at 175. But such expectations can only be of consequence where they are "reasonable" ones. Here, Mississippi law appears to have consistently held that the public trust in lands under water includes "title to all the land under tidewater." *Rouse* v. *Saucier's Heirs,* 166 Miss. 704, 713, 146 So. 291, 291–292 (1933).[11] Although the Mississippi Supreme Court acknowledged that this case may be the first where it faced the question of the public trust interest in nonnavigable tidelands, 491 So. 2d, at 516, the clear and unequivocal statements in its earlier opinions should have been ample indication of the State's claim to tidelands. Moreover, cases which have discussed the State's public trust interest in these lands have described uses of them not related to navigability, such as bathing, swimming, recreation, fishing, and mineral development. See, *e. g., Treuting* v. *Bridge and Park Comm'n of City of Biloxi,* 199 So. 2d 627, 632–633 (Miss. 1967). These statements, too, should have made clear that the State's claims were not limited to lands under navigable waterways. Any contrary expectations cannot be considered reasonable.

We are skeptical of the suggestions by the dissent, *post,* at 485, 493, that a decision affirming the judgment below will have sweeping implications, either within Mississippi or outside that State. The State points out that only one other case is pending in its courts which raises this same issue. Tr. of Oral Arg. 19. And as for the effect of our decision today in other States, we are doubtful that this ruling will do

---

[11] See also *State ex rel. Rice* v. *Stewart,* 184 Miss. 202, 230, 184 So. 44, 49 (1938); *Martin* v. *O'Brien,* 34 Miss. 21, 36 (1857).

more than confirm the prevailing understanding—which in some States is the same as Mississippi's, and in others, is quite different. As this Court wrote in *Shively* v. *Bowlby*, 152 U. S., at 26, "there is no universal and uniform law upon the subject; but . . . each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy."

Consequently, our ruling today will not upset titles in all coastal States, as petitioners intimated at argument. Tr. of Oral Arg. 32. As we have discussed *supra*, at 475, many coastal States, as a matter of state law, granted all or a portion of their tidelands to adjacent upland property owners long ago.[12] Our decision today does nothing to change ownership rights in States which previously relinquished a public trust claim to tidelands such as those at issue here.

Indeed, we believe that it would be far more upsetting to settled expectations to reverse the Mississippi Supreme Court decision. As *amici* note, see, *e. g.*, Brief for State of California et al. as *Amici Curiae* 19, many land titles have been adjudicated based on the ebb-and-flow rule for tidelands—we cannot know how many titles would have to be adjusted if the scope of the public trust was now found to be limited to lands beneath navigable tidal waters only. If States do not own lands under nonnavigable tidal waters, many state land grants based on our earlier decisions might now be invalid. Cf. *Hardin* v. *Jordan*, 140 U. S., at 381–382. Finally, even where States have given dominion over

---

[12] See, *e. g.*, *Bradford* v. *The Nature Conservancy*, 224 Va. 181, 195–198 (1982); *Tinicum Fishing Co.* v. *Carter*, 61 Pa. 21, 30–31 (1869); *Bickel* v. *Polk*, 5 Del. 325, 326 (1851); *Storer* v. *Freeman*, 6 Mass., at 437–439.

It is worth noting, however, that even in some of these States—*i. e.*, even where tidelands are privately held—public rights to use the tidelands for the purposes of fishing, hunting, bathing, etc., have long been recognized. See, *e. g.*, *Bradford*, *supra*, at 191, 197; *Bickel*, *supra*, at 326. Limiting the public trust doctrine to only tidelands under navigable waters might well result in a loss to the public of some of these traditional privileges.

tidelands to private property owners, some States have retained for the general public the right to fish, hunt, or bathe on these lands. See n. 12, *supra*. These long-established rights may be lost with respect to nonnavigable tidal waters if we adopt the rule urged by petitioners.

The fact that petitioners have long been the record title holders, or long paid taxes on these lands does not change the outcome here. How such facts would transfer ownership of these lands from the State to petitioners is a question of state law. Here, the Mississippi Supreme Court held that under Mississippi law, the State's ownership of these lands could not be lost via adverse possession, laches, or any other equitable doctrine. 491 So. 2d, at 521. See Miss. Const., Art. 4, § 104; *Gibson* v. *State Land Comm'r*, 374 So. 2d 212, 216–217 (1979); *City of Bay St. Louis* v. *Board of Supervisors of Hancock County*, 80 Miss. 364, 371–372, 32 So. 54 (1902). We see no reason to disturb the "general proposition [that] the law of real property is, under our Constitution, left to the individual States to develop and administer." *Hughes* v. *Washington*, 389 U. S. 290, 295 (1967) (Stewart, J., concurring). See *Davies Warehouse Co.* v. *Bowles*, 321 U. S. 144, 155 (1944); *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10, 22 (1935). Consequently, we do not believe that the equitable considerations petitioners advance divest the State of its ownership in the disputed tidelands.

## V

Because we believe that our cases firmly establish that the States, upon entering the Union, were given ownership over all lands beneath waters subject to the tide's influence, we affirm the Mississippi Supreme Court's determination that the lands at issue here became property of the State upon its admission to the Union in 1817. Furthermore, because we find no reason to set aside that court's state-law determination that subsequent developments did not divest the

State of its ownership of these public trust lands, the judgment below is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS and JUSTICE SCALIA join, dissenting.

Breaking a chain of title that reaches back more than 150 years, the Court today announces a rule that will disrupt the settled expectations of landowners not only in Mississippi but in every coastal State. Neither our precedents nor equitable principles require this result, and I respectfully dissent from this undoing of settled history.

I

As the Court acknowledges, *ante*, at 478, this case presents an issue that we never have decided: whether a State holds in public trust all land underlying tidally influenced waters that are neither navigable themselves nor part of any navigable body of water. In holding that it does, the majority relies on general language in opinions that recognized state claims to land underlying tidewaters. But those cases concerned land lying beneath waters that were in fact navigable, *e. g.*, *Shively* v. *Bowlby*, 152 U. S. 1 (1894) (Columbia River in Oregon), or beneath waters that were part of or immediately bordering a navigable body of water, *e. g.*, *Mann* v. *Tacoma Land Co.*, 153 U. S. 273 (1894) (shallow tidelands in Commencement Bay in Washington). Until today, none of our decisions recognized a State's public trust title to land underlying a discrete and wholly nonnavigable body of water that is properly viewed as separate from any navigable body of water.

In my view, the public trust properly extends only to land underlying navigable bodies of water and their borders, bays, and inlets. This Court has defined the public trust repeat-

edly in terms of navigability. *E. g., Utah Div. of State Lands* v. *United States,* 482 U. S. 193 (1987); *Montana* v. *United States,* 450 U. S. 544, 551 (1981); *Utah* v. *United States,* 403 U. S. 9, 10 (1971); *United States* v. *Oregon,* 295 U. S. 1, 14 (1935); *United States* v. *Utah,* 283 U. S. 64, 75 (1931); *United States* v. *Holt State Bank,* 270 U. S. 49, 54–55 (1926); *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77, 84–85 (1922); *Oklahoma* v. *Texas,* 258 U. S. 574, 583 (1922); *Pollard's Lessee* v. *Hagan,* 3 How. 212, 230 (1845). It is true that these cases did not involve waters subject to the ebb and flow of the tide. But there is no reason to think that different tests of the scope of the public trust apply to saltwater and to freshwater. Navigability, not tidal influence, ought to be acknowledged as the universal hallmark of the public trust.

The public trust doctrine has its roots in English common law. Traditionally, all navigable waterways in England were by law common highways for the public. M. Hale, De Jure Maris et Brachiorum ejusdem, cap. iii (1667), reprinted in R. Hall, Essay on the Rights of the Crown and the Privileges of the Subject in the Sea Shores of the Realm, App. v (2d ed. 1875). Furthermore, the King held title to the soil beneath the sea and the arms of the sea, "where the sea flows and reflows." Hale, cap. iv, reprinted in Hall, *supra,* at App. vii, ix. When the first American States became sovereign after our Revolution, their governments succeeded to the King's rights with respect to waters within their borders. *Martin* v. *Waddell,* 16 Pet. 367, 410 (1842). New States like Mississippi, upon entering the Union, acquired equivalent rights under the equal-footing doctrine. *Pollard's Lessee* v. *Hagan, supra,* at 228–229. Hence both petitioners and respondents have made an effort to ascertain the extent of the King's rights under English common law.

Unfortunately, English cases of the late 18th and early 19th centuries did not directly address whether the King held title to lands underlying tidally influenced, nonnavigable waters. Certainly the public's right of navigation was limited

to waterways that were navigable in fact, and did not extend to every waterway subject to the ebb and flow of the tide. As Lord Mansfield explained:

> "How does it appear that this is a navigable river? The flowing and reflowing of the tide does not make it so, for there are many places into which the tide flows that are not navigable rivers; and the place in question may be a creek in their own private estate." *Mayor of Lynn* v. *Turner*, 1 Cowp. 86, 98 Eng. Rep. 980, 981 (K. B. 1774).

This principle of British law has proved enduring. See *Rex* v. *Montague*, 4 B. & C. 598, 602, 107 Eng. Rep. 1183, 1184 (K. B. 1825); S. Hobday, Coulson & Forbes on the Law of Waters 100–101 (6th ed. 1952). It appears, however, that the King's title to submerged land was not coextensive with the public's right of navigation. Thus in *Murphy* v. *Ryan*, 2 Ir. R.-C. L. 143, 152 (1868), the court explained that the King did not hold title to the land underlying navigable waters, unless they were influenced by the tide. Accord, *Earl of Ilchester* v. *Raishleigh*, 61 L. T. R. (n. s.) 477, 479 (Ch. 1889); Hobday, *supra*, at 102. It may be that the King also did not hold title to land underlying tidally influenced waters, unless they were navigable. Certainly there are cases that describe the King's proprietary rights as pertaining to land underneath navigable water. *Rex* v. *Smith*, 2 Dougl. 441, 446, 99 Eng. Rep. 283, 285 (K. B. 1780); *Lord Advocate for Scotland* v. *Hamilton*, 1 Macq. 46, 49 (H. L. 1852); *Le Roy* v. *Trinity House*, 1 Sid. 86, 82 Eng. Rep. 986 (K. B. 1662). This strongly suggests that English common law did not authorize the claims that Mississippi makes in this case.

American cases have developed the public trust doctrine in a way that is consistent with its common-law heritage. Our precedents explain that the public trust extends to navigable waterways because its fundamental purpose is to preserve them for common use for transportation.

> "It is, indeed, the susceptibility to use as highways of commerce which gives sanction to the public right of control over navigation upon [navigable waterways], and consequently to the exclusion of private ownership, either of the waters or the soils under them." *Packer* v. *Bird*, 137 U. S. 661, 667 (1891).

Similarly, the Court has emphasized that the public trust doctrine "is founded upon the necessity of preserving to the public the use of navigable waters from private interruption and encroachment." *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387, 436 (1892).

Although the States may commit public trust waterways to uses other than transportation, such as fishing or land reclamation, this exercise of sovereign discretion does not enlarge the scope of the public trust. Even the majority does not claim that the public trust extends to every waterway that can be used for fishing or for land reclamation. Nor does the majority explain why its tidal test is superior to a navigability test for the purpose of identifying waterways that are suited to these other uses.

Because the fundamental purpose of the public trust is to protect commerce, the scope of the public trust should parallel the scope of federal admiralty jurisdiction. This Court long ago abandoned the tidal test in favor of the navigability test for defining federal admiralty jurisdiction, describing the ebb and flow test as "purely artificial and arbitrary as well as unjust." *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 457 (1852). The Court recognized that whether waters are influenced by the tide is irrelevant to the purposes of admiralty jurisdiction, which are to facilitate commerce in times of peace and to administer the special rules of war. *Id.,* at 454. Subsequent admiralty cases confirm that "the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters." *The Daniel Ball,* 10 Wall. 557, 563 (1871).

Having defined admiralty jurisdiction in terms of navigability, the Court applied the same reasoning to the problem of defining the public trust. The Court explained that "the public authorities ought to have entire control of the great passageways of commerce and navigation, to be exercised for the public advantage and convenience." *Barney* v. *Keokuk*, 94 U. S. 324, 338 (1877). And it sweepingly concluded that the tidal test "had no place in American jurisprudence since the decision in the case of *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443." *McGilvra* v. *Ross*, 215 U. S. 70, 78 (1909). These cases defined the public trust in the context of inland waterways. But the same reasoning applies to waterways influenced by the tide. Navigability, not tidal influence, characterizes the waterways that are suited to the purposes of the public trust.

Congress also has evidenced its belief that the States' public trusts are limited to lands underlying navigable waters. In 1953, Congress passed the Submerged Lands Act, 43 U. S. C. §§ 1301–1315. Congress intended to confirm the States' existing rights to lands beneath navigable waters. S. Rep. No. 133, 83d Cong., 1st Sess., pt. 1, p. 8 (1953); H. R. Rep. No. 1778, 80th Cong., 2d Sess., p. 3 (1948); *Bonelli Cattle Co.* v. *Arizona*, 414 U. S. 313, 324 (1973). The Act defines "lands beneath navigable waters" as including lands "covered by tidal waters." 43 U. S. C. § 1301(a)(2). If tidal waters included discrete bodies of *nonnavigable* water, this definition would be self-contradictory. Thus it appears that Congress understood "tidal waters" as referring to the boundaries of the navigable ocean. As Senator Cordon explained, "lands beneath navigable waters" identifies lands "as being under nontidal waters in the upper areas or being in tidal waters and—and I want this emphasized—outside inland waters." 99 Cong. Rec. 2632 (1953). Although the Submerged Lands Act is not at issue in this case, it is evidence of Congress' interpretation of the public

trust doctrine, and that interpretation is entitled to consideration.

In sum, the purpose of the public trust, the analogy to federal admiralty jurisdiction, and the legislative history of the Submerged Lands Act all indicate that the States hold title only to lands underlying navigable waters. The term "navigable waters" is not self-defining, however. It must be construed with reference to cases in which this Court has described the boundaries of the public trust.

For public trust purposes, navigable bodies of water include the nonnavigable areas at their boundaries. The question whether a body of water is navigable is answered waterway by waterway, not inch by inch. The borders of the ocean, which certainly is navigable, extend to the mean high tide line as a matter of federal common law. *United States* v. *Pacheco*, 2 Wall. 587, 590 (1865); see *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 376 (1977). Hence the States' public trusts include the ocean shore over which the tide ebbs and flows. This explains why there is language in our cases describing the public trust in terms of tidewaters: each of those cases concerned the shores of a navigable body of water. See, *e. g.*, *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10, 16 (1935); *United States* v. *Mission Rock Co.*, 189 U. S. 391, 404–405 (1903); *Knight* v. *United States Land Assn.*, 142 U. S. 161, 183 (1891). This does not imply, however, that all tidally influenced waters are part of the sea any more than it implies that the Missouri River is part of the Gulf of Mexico.

The Court holds today that the public trust includes not only tidewaters along the ocean shore, but also discrete bodies of water that are influenced by the tide but far removed from the ocean or any navigable tidal water, such as the separate little streams and bayous at issue here. The majority doubts whether a satisfactory test could be devised for distinguishing between the two types of tidally influenced waters. *Ante*, at 481. It therefore adopts a test that will include in

the public trust every body of water that is interconnected to the ocean, even indirectly, no matter how remote it is from navigable water. This is wholly inconsistent with the federal law that identifies what inland freshwaters belong to the public trust. For example, if part of a freshwater river is navigable in fact, it does not follow that all contiguous parts of the river belong to the public trust, no matter how distant they are from the navigable part. Conversely, federal law does not exclude from the public trust all nonnavigable portions of a navigable river, such as shallow areas near the banks.

> "The question here is not with respect to a short interruption of navigability in a stream otherwise navigable, or of a negligible part, which boats may use, of a stream otherwise non-navigable. We are concerned with long reaches with particular characteristics of navigability or non-navigability . . . ." *United States* v. *Utah,* 283 U. S., at 77 (footnote omitted).

See *Oklahoma* v. *Texas,* 258 U. S. 574 (1922) (applying the navigability test to identify what parts of the Red and Arkansas Rivers belong to the public trust). To decide whether the tidewaters at issue in this case belong to the public trust, the Court should apply the same fact-specific navigability test that it applies to inland waters. It should distinguish between navigable bodies of water and connected, but discrete, bodies of tidally influenced water. To this end, Justice Field once applied the headland to headland test, a "universal rule governing the measurement of waters," and drew a boundary dividing the navigable waters of San Francisco Bay from the tidally influenced waters of Mission Creek. *Knight* v. *United States Land Assn., supra,* at 207 (concurring opinion). Only waterways that are part of a navigable body of water belong to the public trust.

## II

The controversy in this case concerns more than cold legal doctrine. The particular facts of this case, to which the Court's opinion gives short shrift, illustrate how unfortunate it is for the Court to recognize a claim that appears belated and opportunistic.

Mississippi showed no interest in the disputed land from the time it became a State until the 1970's. Petitioners, or prior titleholders, recorded deeds on the land and paid property taxes throughout this period. App. to Pet. for Cert. 41a. In 1973, Mississippi passed the Coastal Wetlands Protection Law. Miss. Code Ann. §§ 49–27–1 to 49–27–69 (Supp. 1987). This statute directed the Mississippi Marine Resources Council to prepare maps identifying state-owned wetlands. The maps, drawn from aerial photographs, were intended to show the probable scope of state-owned wetlands in order to aid state agencies in planning to protect them. § 49–27–65. But the Mineral Lease Commission decided to use the maps as a basis for issuing oil and gas leases on what appeared to be state-owned lands. The Commission leased 600 acres to respondent Saga Petroleum U. S., Inc.

Petitioners, holders of record title, filed a complaint in Chancery Court to quiet title to the 600 contested acres and an additional 1,800 acres in the area. The Chancery Court decided that the public trust included lands underlying all tidally influenced waters. Even under this test, only 140.863 acres of the land belonged to the State of Mississippi. On appeal, the Supreme Court of Mississippi reduced Mississippi's claim by another 98 acres to account for land underlying two artificial lakes. The land now claimed by Mississippi consists of slightly more than 42 acres underlying the north branch of Bayou LaCroix and 11 small drainage streams.

These waterways are not used for commercial navigation. None of the drainage streams is more than a mile long; all are nameless. Mississippi is not pressing its claim for the sake of facilitating commerce, or even to protect the public's inter-

est in fishing or other traditional uses of the public trust. Instead, it is leasing the land to a private party for exploitation of underlying minerals. Mississippi's novel undertaking has caused it to press for a radical expansion of the historical limits of the public trust.

The Court's decision today could dispossess thousands of blameless record owners and leaseholders of land that they and their predecessors in interest reasonably believed was lawfully theirs. The Court concludes that a decision favoring petitioners would be even more disruptive, because titles may have been adjudicated on the assumption that a tidal test defines the public trust. *Ante*, at 483. There is no way to ascertain, as a general matter, what assumptions about the public trust underlie existing property titles. What evidence there is suggests that the majority's rule is the one that will upset settled expectations. For example, the State of New Jersey has decided to apply the Court's test. It now claims for its public trust all land underlying nonnavigable tidal waters, and all land that has been under tidal waters at any time since the American Revolution.

> "Due to this attempted expansion of the [public trust] doctrine, hundreds of properties in New Jersey have been taken and used for state purposes without compensating the record owners or lien holders; prior homeowners of many years are being threatened with loss of title; prior grants and state deeds are being ignored; properties are being arbitrarily claimed and conveyed by the State to persons other than the record owners; and hundreds of cases remain pending and untried before the state courts awaiting processing with the National Resource Council." Porro & Teleky, Marshland Title Dilemma: A Tidal Phenomenon, 3 Seton Hall L. Rev. 323, 325–326 (1972) (footnotes omitted).

See also Brief for the City of Elizabeth, New Jersey, et al. as *Amici Curiae* 17–20 (confirming that these problems have

not abated). The Court's decision today endorses and encourages such action in other States.

Although there is no way to predict exactly how much land will be affected by the Court's decision, the magnitude of the problem is suggested by the fact that more than 9 million acres have been classified as fresh or saline coastal wetlands. S. Shaw & C. Fredine, Wetlands of the United States, United States Department of the Interior, Fish & Wildlife Service, Circular 39, p. 15 (1956). The Federal Government conveyed these lands to the States, which have conveyed many of them to individuals. To the extent that the conveyances to private parties purported to include public trust lands, the States may strike them down, if state law permits. *Illinois Central R. Co.* v. *Illinois*, 146 U. S., at 452–454; see *Coastal Petroleum Co.* v. *American Cyanamid Co.*, 492 So. 2d 339, 342–343 (Fla. 1986), cert. denied *sub nom. Mobil Oil Corp.* v. *Board of Trustees of Internal Improvement Trust Fund of Fla.*, 479 U. S. 1065 (1987); Brief for American Land Title Association as *Amicus Curiae* 2–3. The Court's broad definition of public trust lands will increase the amount of land that is vulnerable to such challenges.

The Court's suggestion, *ante,* at 484, that state law might honor the equitable considerations that support individual claims to public trust lands, is not persuasive. Certainly the Mississippi Supreme Court's decision in this case attached little weight to petitioners' equitable claims. Although Mississippi collected taxes on the land and made no mention of its claim for over 150 years, the Mississippi Supreme Court held that Mississippi was not estopped from dispossessing petitioners. *Cinque Bambini Partnership* v. *State*, 491 So. 2d 508, 521 (1986). The stakes are high when the land lies over valuable oil, gas, or mineral deposits.

The Court's decision departs from our precedents, and I fear that it may permit grave injustice to be done to innocent property holders in coastal States. I dissent.