**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

    v.

32.42 ACRES OF LAND, More or
Less, Located in San Diego
County, State of California; SAN
DIEGO UNIFIED PORT DISTRICT,
          *Defendants,*

    and

CALIFORNIA STATE LANDS
COMMISSION,
          *Defendant-Appellant.*

No. 10-56568

D.C. No.
3:05-cv-01137-
DMS-WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
March 8, 2012—Pasadena, California

Filed June 14, 2012

Before: Harry Pregerson, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

6879

**COUNSEL**

Alan V. Hager (argued), Christina Bull Arndt, and John A. Saurenman, Office of the California Attorney General, Los Angeles, California, for defendant-appellant California State Lands Commission.

John Emad Arbab (argued), Michael T. Gray, and Marc E. Gordon, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for plaintiff-appellee United States.

Georgia Garthwaite, U.S. Department of Justice, Land Acquisition Section, Washington, DC, for plaintiff-appellee United States.

Thomas C. Stahl, Office of the US Attorney, Washington, DC, for plaintiff-appellee United States.

## OPINION

GOULD, Circuit Judge:

The California State Lands Commission (the "Lands Commission") appeals the district court's final judgment in this eminent domain case, wherein the United States took a fee simple interest in about 32.42 acres of land (the "Property") on behalf of the Navy, which has continuously leased this parcel since 1949. In condemning the Property, the United States sought to extinguish California's public trust rights. The Lands Commission contends that California's public trust rights cannot be extinguished by the United States' power of eminent domain. The Lands Commission does not dispute the United States' power to take and use the land without trust restrictions. Instead, it asks us to hold that California's public trust rights become "quiescent" while the United States owns the land but will "re-emerge" if the United States seeks to transfer the Property to a private party.

The district court held that the United States' condemnation extinguished California's public trust on the entire parcel, and that the 27.54 acres which are filled can be conveyed to a private party free of any trust, but that the 4.88 acres that remained tidelands at the time of the taking are now subject to a federal public trust and may not be conveyed to a private party. The issue before us is whether the United States can extinguish California's public trust rights when exercising its federal power of eminent domain. We hold that it can, and affirm the judgment of the district court.

## I

The Lands Commission is a unit of California's state government that provides stewardship of the lands, waterways,

and resources entrusted to its care. The Lands Commission does this by economic development, protection, preservation, and restoration of lands. The Lands Commission has all jurisdiction remaining in the state as to tidelands and submerged lands granted in trust by the Legislature to local government entities. CAL. PUB. RES. § 6301.

The Property is located in the City of San Diego ("City") on the south side of North Harbor Drive at Nimitz Boulevard, and is now occupied by the Navy's Fleet Anti-Submarine Warfare Training Center. In 1850, the State of California acquired this land as an attribute of its sovereignty upon admission to the Union. In 1911, the California Legislature granted the Property to the City, subject to California's common law public trust. In 1949, the Property was leased to the Navy for 50 years, with a right to renew for an additional 50 years, as part of a land exchange with the City. In 1963, the City transferred the lands to the newly formed San Diego Port District ("Port") subject to the public trust and the Navy lease. Over time, the Property has been filled to expand the Navy's Training Station. Today only 15% of it (4.88 acres) is covered with water. But the entire parcel was subject to California's public tidelands trust at the time of the federal condemnation action because it was entirely underwater when California joined the Union in 1850.

When the Navy sought to exercise its exclusive option to renew the lease in 1996, the Port and the Lands Commission opposed the extension, and the United States brought a condemnation action to enforce its rights under the lease. *See generally United States v. Polar Star*, 668 F.3d 1119, 1124 (9th Cir. 2012) ("An eminent domain claim can be used by the Government to quiet title to its [leasehold] interest in a property"). The district court granted summary judgment in favor of the United States, but that order was later withdrawn as part of a settlement agreement dismissing California's appeal from that order and granting the United States a lease in the Property through August 2049. In 2005, the Navy

decided that it wanted to own the Property in fee simple. In May 2005, the United States filed a complaint in condemnation and declaration of taking in the Southern District of California. The complaint explicitly lists "any tidelands trust rights of the State of California" as part of the estate to be taken.

The Port objected to the taking on many grounds. The district court overruled those objections and they are not part of this appeal. At issue is the Lands Commission's motion for summary judgment, wherein it contends that the United States could not extinguish California's public trust rights. The district court denied the Lands Commission's motion in April 2006, holding that the United States' condemnation of the Property extinguished California's public trust in the entire parcel, that the 27.54 acres of filled land are free of any public trust restrictions, but that the 4.88 acres that remain tidelands are now subject to a federal public trust. A trial followed to determine the amount of just compensation, estimated by the Untied States at $237,000, but set by a jury at $2,910,000. The district court entered final judgment in August 2010, and the Lands Commission timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II

[1] We review the district court's denial of summary judgment *de novo*. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1041 (9th Cir. 2011). Eminent domain is a proceeding *in rem* that permits the United States to take all interests in a property. *A.W. Duckett & Co. v. United States*, 266 U.S. 149, 151 (1924). Through eminent domain, the United States takes not just the rights of designated persons in the property, but the property itself, establishing a new title and obliterating previous interests not specifically excepted. *Burkhart v. United States*, 227 F.2d 659, 661-62 (9th Cir. 1955). The United States' power of eminent domain is supreme when exercised within its constitutional powers.

*United States v. Carmack*, 329 U.S. 230, 240 (1946); U.S. Const., art. VI, cl. 2. The federal government does not need the consent of a state or local subdivision to take its property for public use, so long as the federal government acts within its constitutional authority and pays just compensation. *Carmack*, 329 U.S. at 240-42.

Here, the United States is taking a full fee simple interest in the Property under its powers to "provide for the common Defense," to "provide and maintain a Navy," and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U.S. Const. art. I, § 8, cl. 1, 13, 18. The United States has followed the procedure outlined in 40 U.S.C. § 3114, and its action was duly authorized by 10 U.S.C. § 2672 (2005) at the time of the taking.[1] The declaration of taking specifically lists "any tidelands trust rights of the State of California" in the Property as part of the estate to be taken. The parties agree that the federal government may take the Property, and that so long as it owns the Property it may put it to any use, including non-trust uses. They disagree about what will happen if the United States transfers ownership of the Property to a private party in the future.

**[2]** The Lands Commission contends that the public trust is an aspect of state sovereignty that the federal government is without power to extinguish, or at least has no power to extinguish in this case. The Lands Commission argues that California's interest in its public trust rights is as important as the United States' interest in its power of eminent domain. The Lands Commission urges us to reconcile these interests by holding that the declaration of taking does not extinguish public trust rights, but instead only makes the public trust "quiescent," such that the public trust has no effect while the United States owns the Property, but can "re-emerge" if the

---

[1]Section 2672 has since been recodified at 10 U.S.C. § 2663(c) by Pub. L. No. 109-163, § 2821(a)(2), 119 Stat. 3511 (2006).

land is later sold to a private party. This solution might be considered if we were charged with reconciling immovable public trust rights with the powerful force of eminent domain. But no such conflict of values exists. None of the authorities discussing the equal-footing doctrine cited by the Lands Commission inhibits or restricts the federal government from exercising its constitutional power of eminent domain. When and to the extent that state law public trust rights conflict with federal takings law, the Supremacy Clause dictates that federal takings law prevails. U.S. Const., art. VI, cl. 2.

### III

The Lands Commission's argument misapprehends the equal-footing doctrine, which gives a state presumptive title to its submerged lands when it joins the Union. The United States Supreme Court dealt with title to tidal and submerged land in the original thirteen states in *Martin v. Waddell's Lessee*, 41 U.S. 367 (1842). There, the Supreme Court resolved a property dispute over who had the right to harvest oysters in a certain oyster bed in New Jersey. *Id.* at 407. The plaintiff claimed the tideland by tracing title back to the charters given to the Duke of York in the late 1600s and his subsequent grant to the 24 Proprietors of East New Jersey. The defendant claimed his right under an 1824 New Jersey law allowing him to lease oyster land from the state. *Id.* at 408. To resolve the case, the Court had to determine who held title to the oyster bed: the plaintiff or the State of New Jersey.

The Supreme Court concluded that New Jersey held title, reasoning that the title to land under navigable water was not a private property right retained by the Proprietors, but one of the royal rights held by the sovereign in public trust for the benefit of the community. *Id.* at 413-16. As such, it was one of the rights surrendered to Queen Anne by the Proprietors in 1702, and then passed to the State of New Jersey at the time of the Revolution. *Id.* at 415-16. The practical effect of *Martin* was to establish that the original thirteen states held clear

title to their navigable waters and tidelands, absent the use of "clear and especial words" suggesting otherwise, in a pre-Revolution grant of land. *Id.* at 411-12.

[3] Three years later the Supreme Court first applied the equal-footing doctrine to hold that new states also received clear title to their navigable waters and tidelands from the United States when they entered the Union. *Pollard's Lessee v. Hagan*, 44 U.S. 212, 230 (1845). Under the equal-footing doctrine, when a new state is admitted into the Union, it gains "the same rights, sovereignty and jurisdiction in that behalf as the original States possess within their respective borders." *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 474 (1998) (quoting *Knight v. U.S. Land Ass'n*, 142 U.S. 161, 183 (1891)). These rights include "absolute property in, and dominion and sovereignty over, the soils under the tide waters," *id.* (quoting *Knight*, 142 U.S. at 183), as well as the "lands under navigable freshwater lakes and rivers," *id.* at 479. Before a state's admission to the Union, these rights "are held by the United States for the benefit of the whole people," and "in trust for the future States." *Shively v. Bowlby*, 152 U.S. 1, 49 (1894).

## A

[4] The Lands Commission contends that the equal-footing doctrine required the United States to have "some compelling reason for granting away" submerged lands because courts did not "lightly infer" such a grant when the United States held title to submerged lands before statehood. It goes on to argue that the power of eminent domain should not be construed to "allow Congress to do what it could not do when the states were but territories," free land from the state's public trust without a compelling reason for doing so, and so the equal-footing doctrine prevents the United States from extinguishing California's public trust rights. We reject this argument because it is based on a false premise. The Property Clause gives the United States power to divest a future state

of its entire title in submerged lands so long as the federal government makes its intention to do so plain and the conveyance is for a public purpose. U.S. Const. art. IV, § 3, cl. 2; *United States v. Alaska*, 521 U.S. 1, 33 (1997).

**[5]** When deciding questions of title to submerged lands under the equal-footing doctrine, a court begins "with a strong presumption against defeat of a State's title." *Id.* at 34 (quotation marks omitted). This presumption can be rebutted if the submerged land was conveyed to a third party or set aside as a federal reservation before statehood, but only if the intention to do so "was definitely declared or otherwise made very plain." *United States v. Holt State Bank*, 270 U.S. 49, 55 (1926). The United States has, as a policy matter, refrained from granting submerged lands to third parties absent "exceptional instances." *Id.* This was a policy choice by Congress, not a limitation on Congress's power imposed by the equal-footing doctrine. *Alaska*, 521 U.S. at 40.

**B**

The Lands Commission argues that the equal-footing doctrine prevents the United States from extinguishing California's public trust rights by eminent domain because "[n]othing but the Constitution can take away from the states what they received under the equal footing doctrine." The Lands Commission presents out of context quotations from cases such as *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977) and *Pollard's Lessee*, where the Supreme Court held that the federal government did not have any title in a state's submerged lands to convey to third parties after the state had entered the Union, and from this seeks to fashion a limitation on the United States' eminent domain power. *Corvallis Sand* states that "the Federal Government has no power to convey lands which are rightfully the State's under the equal-footing doctrine," 429 U.S. at 376, while *Pollard's Lessee* reasons that:

> To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers.

44 U.S. at 230.

In our view, the above quoted cases do not at all support the Lands Commission's argument. Under the rule in *Pollard's Lessee*, the equal-footing doctrine vested new states with title to their submerged lands at the time they entered the Union. *Alaska*, 521 U.S. at 4. Once title was vested, "the force of that doctrine was spent," so subsequent questions of land title, such as ownership of land uncovered when a river moves, are a matter of state law. *Corvallis Sand*, 429 U.S. at 370-71. This means that a state's title to lands which passed to it under the equal-footing doctrine are "not subject to defeasance" by operation of federal law when the lands are uncovered; rather "state law governs subsequent dispositions" of submerged lands. *Id.* at 378.

The equal-footing doctrine prevented the United States from transferring title in these cases because the grants at issue were post-statehood grants of land that had already passed to the state. *See Corvallis Sand*, 429 U.S. at 365-68; *State ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 283 Ore. 147, 151 n.4 (1978); *Pollard's Lessee*, 44 U.S. at 222-24. The state held title to the land, so the federal government had no property rights to grant to third parties. That the United States cannot grant property rights it does not have does not mean that it cannot gain new property rights through its power of eminent domain.

## C

**[6]** The Lands Commission relies on the law of federal navigational servitude in trying to make its case. We are not

persuaded. The federal navigational servitude derives from the Commerce Clause, ensuring that:

> All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various states and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the federal government by the constitution.

*Corvallis Sand*, 429 U.S. at 375-76 (quoting *Gibson v. United States*, 166 U.S. 269, 271-72 (1897)). The Lands Commission contends that the federal navigational servitude defines "the extent to which the states have surrendered their public trust rights by the Constitution." It relies on quotations such as:

> Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the General government.

*Weber v. Bd. of Harbor Comm'rs*, 85 U.S. 57, 65-66 (1873). The Lands Commission argues that "the scope of that surrender determines the limits of the federal government's eminent domain authority over" California's public trust rights, and that these surrendered rights "do not include the ability of the states to protect their sovereign lands from the federal government's selling those lands free of the public trust." Again, the Lands Commission mistakenly equates a restriction on what

the United States may do when it does not have title to land into a limitation on when the United States may take unencumbered title through eminent domain. There is no precedent nor any good reason to thus limit the federal constitutional power to take land for public use while paying just compensation. We hold that the scope of the federal navigational servitude does not limit the United States' power of eminent domain.

## IV

The Lands Commission contends that the public trust doctrine restricts the ability of both federal and state governments to alienate public trust lands free of the public trust. It invokes *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892), where the Supreme Court held that a grant of submerged land by the Illinois Legislature was necessarily revocable, such that the legislature's subsequent repeal of that grant did not violate the Fourteenth Amendment or the Contracts Clause. The legislature had granted Illinois Central Railroad substantial portions of the Chicago waterfront and all of the Chicago harbor for its private use. In holding that grant revocable, the Court reasoned that:

> The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State. The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining.

*Id.* at 455-56. The Lands Commission argues that this reasoning distinguishes California's title in "sovereign public trust lands" from its interest in "proprietary lands," and that its public trust rights cannot be extinguished because they are an

aspect of its sovereignty. But the Lands Commission presents no valid reason why this state law distinction restricts federal power.

*Illinois Central* has been cited by the Supreme Court of California as "the primary authority even today, almost nine decades after it was decided," on the state's sovereign duties and powers as trustee of the public trust. *Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 437 (1983). *Illinois Central* has also been repeatedly recognized by the Supreme Court of the United States as "necessarily a statement of Illinois law." *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012) (quoting *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 285 (1997)). It is state law that determines what rights and privileges in submerged lands may be granted by a state to private individuals:

> [E]ach State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public.

*Shively*, 152 U.S. at 26. The powers and privileges of states are deeply respected in our federal system, but when there is a conflict between state and federal law, it is federal law that has supremacy. U.S. Const., art. VI, cl. 2; *see id.*, amend. X.

While the equal-footing doctrine is grounded in the Constitution, "the public trust doctrine remains a matter of state law," the contours of which are determined by the states, not by the United States Constitution. *PPL Montana,* 132 S. Ct. 1215 at 1235. Holding that California's public trust interest in the Property survives the federal government's attempt to condemn it would subjugate the federal government's eminent domain power to California's state law public trust doc-

trine. *See Carmack*, 329 U.S. at 240-42; *United States v. 11.037 Acres of Land*, 685 F.Supp. 214, 217 (N.D. Cal. 1988) (holding that California's public trust is extinguished by United States' declaration of taking because state law public trust is trumped by federal power). The Supremacy Clause prevents this outcome. U.S. Const., art. VI, cl. 2.

## V

**[7]** Finally, the Lands Commission argues that the United States' taking of the Property subject to a "quiescent" trust would serve the Navy's purpose equally well, so preserving California's public trust would not frustrate the federal government's power of eminent domain. We reject this argument. The United States is seeking to extinguish California's public trust, and whether it could accomplish its objective by taking a lesser interest in the Property is irrelevant. "Once an administrative agency designated by Congress has been delegated authority to take lands for a public use, the courts have no jurisdiction to review action of that administrative agency in its determination as to the parcels of land that are or are not necessary to the project." *United States v. 0.95 Acres of Land*, 994 F.2d 696, 699 (9th Cir. 1993) (quoting *United States v. 80.5 Acres of Land*, 448 F.2d 980, 983 (9th Cir. 1971)). The United States Navy has determined that it wants to take the Property in full fee simple, unencumbered by California's public trust, to fulfill its military mission for the nation. We do not have jurisdiction to review the wisdom of that determination.

## VI

In the well-chosen words of Justice Holmes, "if there is such a thing as a new title known to the law, one founded upon the taking by the right of eminent domain is as clear an example as can be found." *Emery v. Boston Terminal Co.*, 178 Mass. 172, 184 (1901). The United States seeks to establish such a new title here, and has paid the $2,910,000 a jury

determined was just compensation to extinguish the property rights of California and the San Diego Port District. Having paid just compensation, the United States is entitled to the interest it sought in its complaint in condemnation: full fee simple, free of California's public trust. We have concluded that neither the equal-footing doctrine nor the public trust doctrine prevents the federal government from taking that interest in the land unencumbered.[2]

**AFFIRMED.**

---

[2]Because the United States did not appeal from the district court's determination that a federal public trust arises in the 4.88 acres of the Property that currently remain tidelands, we do not address that determination.