## MISSION ROCK CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 16, 1901.)

### No. 682.

1. PUBLIC LANDS—TIDE LANDS IN CALIFORNIA--TITLE OF STATE.

The title which the United States acquired from the republic of Mexico, by the treaty of Gaudalupe Hidalgo, to the lands under the tide waters of the Bay of San Francisco, passed to the state of California on its admission into the Union, subject to the paramount right of navigation over the waters so far as the same may be required by the necessities of commerce with foreign nations or among the several states, the regulaton of which remains vested in the United States; and the state became thereby vested with the right to use any of such lands, or to grant to others the right to use them, in any manner which would aid, or would not impair, the use of the waters for the purposes of commerce and navigation.

2. SAME—VALIDITY OF GRANT BY STATE—ISLANDS.

The state of California, under Act April 4, 1870 (St. Cal. 1869-70, p. 801), granted to an individual certain submerged lands in San Francisco Bay, about 14 acres in extent, and surrounding Mission Rock and another small island near it, on condition that the grantee or his assigns should, prior to the issuance of the patent, have constructed "a marine railway or dry dock at said Mission Rock," which was a rocky island, devoid of soil, having an area of .14 of an acre above ordinary high-water mark. The other island was similar, but still smaller. The grantee conveyed the lands to a company which filled in portions of the submerged lands immediately surrounding the islands, increasing the available area to about 4 acres, upon which it built extensive warehouses and wharves for the accommodation of shipping, which it has ever since maintained and used; the limits of its docks and improvements having been established and prescribed in 1890 by the United States harbor engineers, with the approval of the secretary of war. In 1899 the president issued an order declaring the islands permanently reserved for naval purposes, and subsequently the United States brought an action against the dock company to recover possession of all the lands claimed by it under the grant from the state, including the islands, with damages for their detention and their rental value while used by defendant. *Held*, that the grant made by the state, so far as it related to submerged lands, was within its powers and valid for the purposes for which it was made, and for which the lands were used, and so long as it remained unrevoked, and the lands continued to be used in aid of commerce and navigation in conformity to the harbor regulations, the company could not be ousted from its possession, but that such grant conveyed no title to nor right in the islands themselves, which, never having been granted to private parties by the authorities of Spain or Mexico, by the treaty of cession became and remained public lands of the United States.

3. SAME—ACT RELINQUISHING TITLE TO CITY OF SAN FRANCISCO—CONSTRUCTION.

By Act July 1, 1864 (13 Stat. 332), the United States relinquished to the city of San Francisco its right and title to all lands within the corporate limits of the city, for the uses and purposes of an ordinance

previously adopted by the city and ratified by the state, which granted and relinquished the right of the city in such lands, with certain exceptions, to the parties in the actual possession thereof, for whom the city held the title in trust through proceedings under the prior act of congress of March 3, 1851 (9 Stat. 631), for the ascertainment and settlement of private land claims in California. The purpose of the later act was to confirm the titles of such private owners under the city grant and the title of the city to the lands reserved for public purposes. It excepted from the relinquishment such lands as were then occupied by the government, and "such other sites or parcels as may hereafter be designated by the president of the United States within one year after the rendition to the general land office by the surveyor general of an approved plat of the exterior limits of San Francisco." No such plat was ever filed or rendered to the general land office. *Held*, that such act did not operate to relinquish the title of the United States to certain rocks or islands in the bay, then a half mile from the shore, and which, while within the exterior limits of the city, were not within any of the uses or purposes designated in the ordinance, and were neither claimed by any private person, nor occupied by the city.

In Error to the Circuit Court of the United States for the Northern District of California.

Page, McCutcheon, Harding & Knight, for plaintiff in error.
Marshall B. Woodworth, U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was an action of ejectment originally brought by the United States against the California Dry-Dock Company, a corporation, for the recovery of the possession of a tract of land containing 14.69 acres, and including the rock known as "Mission Rock," and a small adjacent rock, in the Bay of San Francisco, together with damages for the withholding of the premises, and rents, issues, and profits thereof, aggregating $355,000. The defendant Mission Rock Company, a California corporation, having, pending the action, acquired all the right, title, and interest of the California Dry-Dock Company in the premises sued for, was, by an order of the court, based upon the request of the respective parties, substituted for the original defendant, and the action continued against it. The case comes before us on the judgment roll, and upon findings of fact which appear to have been agreed to by the respective parties. From those findings it appears that the title of the United States to the lands in controversy, under the treaty of Guadalupe Hidalgo, as successor of the Mexican republic, has not since been devested by patent or other conveyance, and that the title thereto is still in the United States, unless the same passed to the state of California by virtue of the admission of that state into the Union under the act of congress of September 9, 1850, or unless the United States relinquished its title thereto under subsequent acts of congress. At the time of the admission of California into the Union the premises sued for consisted of two rocks or islands adjacent to one another, and projecting above the plane of ordinary high water in the Bay of San Francisco, the larger of which rose to a height of more than 20 and less than 40 feet above

such high water, and of other lands contiguous thereto and surrounding the rocks or islands, which were completely submerged, and over which the daily tides continuously flowed and ebbed. The areas of these rocks or islands above ordinary high-water mark at the time of the admission of the state into the Union were as follows: The one called "Mission Rock" had an area of .14 of an acre; the other an area of .01 of an acre. These rocks or islands rose abruptly out of the bay. Their sides, to the extent that they were covered and uncovered by the flow and ebb of the tide, varied from 10 to 25 feet, depending on their steepness. Both rocks were barren, without soil or water, and were of no value for agricultural or mining purposes. They lay at a distance of about half a mile from the then shore line of that part of the bay upon which the city of San Francisco fronted. Navigable waters divided and still divide the lands sued for from the mainland, and surrounded and now surround them; and they were not, at the date of the admission of California into the Union, within the boundaries of any valid private or pueblo grant of lands of the Spanish or Mexican governments. No approved plat of the exterior limits of the city of San Francisco, as provided by the terms of section 5 of the act of congress of July 1, 1864 (13 Stat. 332), has been filed or rendered to the general land office of the United States or of the state of California. The lands sued for are within such exterior limits. On the 13th day of January, 1899, the president of the United States, purporting to act in conformity with that act of congress, issued the following order:

"Executive Mansion.

"January 13, 1899.

"It is hereby ordered that Mission Island and the small island southeast thereof, designated on the official plat on file in the general land office, approved October 12, 1898, as lots 1 and 2 of section 11, township 2 south, range 5 west, Mount Diablo meridian, California, containing, according to the plat, fourteen one-hundredths of an acre and one one-hundredth of an acre, respectively, be, and they are hereby, declared as permanently reserved for naval purposes. William McKinley."

On the ———— day of March, 1864, the United States surveyor general for the state of California extended the public surveys so as to comprehend and include the rocks or islands and the lands in controversy. On April 4, 1870, the governor of the state of California approved an act of the legislature of the state entitled "An act to provide for the sale and conveyance of certain submerged lands in the city and county of San Francisco to Henry B. Tichenor" (St. 1869–70, p. 801), which lands therein described included the lands sued for in this action. On the 11th day of July, 1872, the state of California, in conformity with the act of April 4, 1870, issued its patent for the lands in controversy herein to Tichenor, purporting to convey the same to him, which patent was duly recorded. After the execution of the patent Tichenor executed a deed of grant, bargain, and sale, of date May 1, 1878, purporting to convey the lands in controversy to the California Dry-Dock Company, which thereafter, and on the 6th day of June, 1900, executed to the defendant Mission Rock Company a like deed to the same lands,

which still holds whatever rights it thereby acquired, and into the possession of which lands the Mission Rock Company then entered and has ever since remained. After the execution of the deed by Tichenor to the California Dry-Dock Company, that company undertook the improvement of the lands covered by the deed by filling in portions of the submerged lands immediately around and contiguous to the rocks or islands with many thousands of tons of rock, thus increasing the available area of the lands to about 4 acres, upon which extensive warehouses were built by it, and wharves erected for the accommodation of shipping. Ever since the issuance of the patent by the state of California to Tichenor, the patentee and those holding under him have been in the continuous and uninterrupted possession of the lands covered by the patent, using the same and the improvement thereon for commercial purposes, and claiming to be the absolute owner thereof. On the 7th day of April, 1890, Col. George H. Mendell, then in charge of the corps of engineers of the United States army on the Pacific Coast, caused to be served on the California Dry-Dock Company the following notice:

"United States Engineer's Office, No. 533 Kearny Street.

"San Francisco, Cal., April 7th, 1890.

"Captain Oliver Eldridge, President California Dry-Dock Company, 303 California Street, San Francisco, Cal.—Sir: Under the provisions of section 12 of the river and harbor act of August 11th, 1888 (a copy of which is inclosed), a board of engineer officers was appointed to establish the harbor line of San Francisco harbor and adjacent waters. There is transmitted herewith for your information a map upon which are shown the limiting lines of wharves, and the line beyond which no deposits shall hereafter be made at Mission Rock, as established by the board and approved by the secretary of war March 24th, 1890.

"Very respectfully,    G. H. Mendell,

"Colonel, Corps of Engineers."

The limits referred to in this letter and delineated in the map are, in effect, the limits of Mission Rock as approved at that time.

Upon the facts so found and agreed to by the respective parties the court below gave the government judgment for the possession of the premises sued for, with costs, but without any damages, rents, issues, or profits. The appeal is from that judgment.

From the foregoing statement of the case it will be seen that the judgment is not limited to the two rocks or islands embraced in the executive order of January 13, 1899, the one covering .14 and the other .01 of an acre, but awards the government the entire tract of 14.69 acres, including the warehouses and other improvements constructed by the defendant and its predecessors in interest. The case therefore involves not only legal questions of great importance, but also property rights of great value. As no part of the property in controversy ever was within any private or pueblo grant, the title to the whole tract in question passed to the United States, as the successor of the republic of Mexico. The questions are, has the title to the whole or any part of the premises passed out of the United States, and, if so, subject to what, if any, conditions?

The act of congress of September 9, 1850, admitting California into the Union "on an equal footing with the original states in all respects whatever," was subject to the "express condition that the people of said state shall never interfere with the primary disposal of the public lands within its limits, and shall pass no law and do no act whereby the title of the United States to, and right to dispose of, the same shall be impaired or questioned; and that they shall never lay any tax or assessment of any description whatsoever upon the public domain of the United States, and in no case shall non-resident proprietors, who are citizens of the United States, be taxed higher than residents; and that all the navigable waters within the said state shall be common highways, and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, impost, or duty therefor: provided, that nothing herein contained shall be construed as recognizing or rejecting the propositions tendered by the people of California as articles of compact in the ordinance adopted by the convention which formed the constitution of that state." Substantially the same language was used by congress in the admission of each of the new states. There is, therefore, and can be, as said by the supreme court in Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 434, 13 Sup. Ct. 110, 36 L. Ed. 1018, "no distinction between the several states of the Union in the character of the jurisdiction, sovereignty and dominion which they may possess and exercise over persons and subjects within their respective limits." In that case the court further declared it to be the settled law of this country "that the ownership of and dominion and sovereignty over lands covered by tide waters within the limits of the several states, belonged to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states." And, speaking with direct reference to the title to the soil under the tide waters of the Bay of San Francisco, the same court held in Weber v. Board, 18 Wall. 57, 65, 21 L. Ed. 798, that although such title was acquired by the United States by the cession from Mexico, equally with the title to uplands, they held it only in trust for the future state. "Upon the admission of California into the Union upon an equal footing with the original states," said the court, "absolute property in and dominion and sovereignty over all soils under the tide waters within her limits passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation of the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government." It does not remain open to question, therefore, that the state of California acquired by the act of congress of September 9, 1850, title

to the soil under the tide waters of the Bay of San Francisco, subject to the paramount right of navigation over the waters, so far as the same may be required by the necessities of commerce with foreign nations or among the several states, the regulation of which remains vested in the United States. In view of the decision of the supreme court in the case of Illinois Cent. R. Co. v. Illinois, supra, the right of the state to dispose of such lands, however, does not seem to be as broad as it was declared to be in the case of Weber v. Board; for in Illinois Cent. R. Co. v. Illinois, the court, in speaking of the title of the state of Illinois to the lands under the navigable waters of Lake Michigan, said:

"That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States holds in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the creation of wharves, docks, and piers therein, for which purpose the state may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objection can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state. But that is a very different doctrine from the one which would sanction the abdication of the general control of the state over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public. The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interest of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. General language sometimes found in opinions of the courts, expressive of absolute ownership and control by the state of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular cases. A grant of all the lands under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for

the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the state the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the state. * * * Any grant of the kind is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time. Undoubtedly there may be expenses incurred in improvements made under such a grant which the state ought to pay; but, be that as it may, the power to resume the trust whenever the state judges best is, we think, incontrovertible. The position advanced by the railroad company in support of its claim to the ownership of the submerged lands, and the right to the erection of wharves, piers, and docks at its pleasure or for its business, in the harbor of Chicago, would place every harbor in the country at the mercy of a majority of the legislature of the state in which the harbor is situated."

Under the rule declared in the case last cited there can be no valid objection to the grant by the state of a comparatively small part of the submerged lands of the bay, made, as was the grant to Tichenor, under whom the defendant company claims, in aid, to some extent, of commerce, so long, at least, as the grant is unquestioned by the state, and the improvements are made under and subject to the control of the United States, which is the case before us; for the act of California providing for the sale and conveyance to Tichenor of the submerged lands in controversy, and for which the state's patent was thereby authorized, expressly provided that "such patent shall not be issued until said Tichenor, his heirs or assigns, shall have constructed a marine railway or dry dock at said Mission Rock" (St. Cal. 1869–70, p. 801), and the findings of the court below show that the United States engineer department prescribed the line beyond which the defendant company and its predecessors in interest were precluded from filling in the submerged land covered by the grant from the state. A large and valuable part of the city of San Francisco, extending from the present water front to, in some places, Montgomery street, was at the time of and subsequent to the admission of California into the Union a part of the submerged lands of the bay, but has since been filled in by the many hundred grantors under the city and state, who have erected buildings and improvements thereon at costs running into many millions of dollars. All of this was done in aid of commerce, in the upbuilding of a great city upon the bay, and with the encouragement and consent of the general government. Under such circumstances, we regard it as very clear that no court would be justified in holding titles thus secured invalid. Upon the facts appearing, we are of the opinion that the United States is not entitled to recover from the defendant any of the submerged land included in the grant from the state of California to the predecessor in interest of the defendant. We are further of opinion, however, that that grant did not include the two rocks or islands above men-

109 F.—49

tioned, for the reason that neither of them ever passed to the state. They no more constituted submerged land than did the island of Alcatraz, also situated in the Bay of San Francisco, upon which the government has erected and now, maintains important fortifications. That island, it is true, is much larger than the larger of the two islands or rocks here in controversy; the Island of Alcatraz being about 600 yards long by about 260 yards in breadth, and rising to an elevation of 137 feet above the bay. Like the two islands in controversy, however, it is composed almost entirely of rock. Pacific Coast Pilot, 182. The relative size, however, of the rocks or islands does not change their legal character. Neither of them is submerged, and all alike project above the surface of the bay, and do not, and never did, constitute any part of the submerged or tide lands which passed to the state. The title acquired by the United States to the rocks and islands in question, as successor of the Mexican republic, was not relinquished by the provisions of section 5 of the act of congress of July 1, 1864 (13 Stat. 332), which reads as follows:

"Sec. 5. And be it further enacted, that all the right and title of the United States to the lands within the corporate limits of the city of San Francisco, as defined in the act incorporating said city, passed by the legislature of the state of California, on the fifteenth of April, one thousand, eight hundred and fifty-one, are hereby relinquished and granted to the said city and its successors, for the uses and purposes specified in the ordinances of said city, ratified by an act of the legislature of the said state, approved on the eleventh of March, eighteen hundred and fifty-eight, entitled 'An act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the common council of said city,' there being excepted from this relinquishment and grant all sites or other parcels of land which have been, or now are, occupied by the United States for military, naval, or other public uses, or such other sites or parcels as may hereafter be designated by the president of the United States, within one year after the rendition to the general land office, by the surveyor general, of an approved plat of the exterior limits of San Francisco, as recognized in this section, in connection with the lines of the public surveys; and provided, that the relinquishment and grant by this act shall in no manner interfere with or prejudice any bona fide claims of others, whether asserted adversely under rights derived from Spain, Mexico, or the laws of the United States, nor preclude a judicial examination and adjustment thereof."

The act of July 1, 1864, was in aid and furtherance of the act of congress of March 3, 1851 (9 Stat. 631), the purpose of which was, as its title declared, the ascertainment and settlement of private land claims in California. To the board of land commissioners created by that act the city of San Francisco, which had been incorporated in April, 1850, as a city by the state government, presented its claim to four square leagues of land, as the successor of the Mexican pueblo. Those proceedings resulted in a decree of the circuit court of the United States for the district of California, entered on the 18th of May, 1865, confirming the claim of the city to a tract of land embracing so much of the upper portion of the peninsula which is situated above ordinary high-water mark of 1846 as would contain an area of four square leagues; the tract being bounded on the north and east by the Bay of San Francisco, on the west by the Pacific Ocean, and on the south by

a due east and west line drawn so as to include the area designated, subject to certain deductions, which it is unnecessary to mention. The confirmation was to San Francisco in trust for the benefit of lot holders under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue in trust for the benefit of the inhabitants of the city. City and County of San Francisco v. Le Roy, 138 U. S. 656, 665, 11 Sup. Ct. 364, 34 L. Ed. 1096. Pending those proceedings for the confirmation of the city's claim, to wit, April 16, 1851, its charter of 1850 was repealed, and a new charter adopted (St. Cal. 1851, p. 357); and on the 20th day of June, 1855, what is generally known as the "Van Ness Ordinance" was adopted by the city of San Francisco, by which the city relinquished and granted all its right and claim to the land within its corporate limits as defined by its charter of 1851, with certain exceptions, to parties in the actual possession thereof, by themselves or tenants, on or before the 1st day of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or, if interrupted by an intruder or trespasser, had been or might be recovered by legal process; and it declared that, for the purposes contemplated by the ordinance, persons should be deemed possessors who held titles to land within those limits by virtue of a grant made by any ayuntamiento, town council, alcalde, or justice of the peace of the former pueblo before the 7th of July, 1846, or by virtue of a grant subsequently made by the authorities, within certain limits of the city, previous to its incorporation by the state, provided the grant, or a material portion of it, had been recorded in a proper book of records in the control of the recorder of the county previous to April 3, 1851. The city, among other things, reserved from the grant all the lots which it then occupied or had set apart for public squares, streets, and sites for school houses, city hall, and other buildings belonging to the corporation. In March, 1858, the legislature of the state of California ratified and confirmed that ordinance (St. Cal. 1858, p. 52), and by the fifth section of the act of congress of June 1, 1864, above quoted, the right and title of the United States to the lands claimed within the corporate limits of the charter of 1851 were relinquished and granted to the city and its successors for the uses and purposes specified in the Van Ness ordinance. Those uses and purposes, as will readily be seen from the foregoing statement of them, had no relation whatever to the rocks or islands here in controversy, which were and are far outside of the pueblo grant of lands claimed by and confirmed to the city.

From the views above expressed, it results that the judgment must be, and hereby is, reversed, and the cause must be, and hereby is, remanded to the court below, with instructions to enter judgment for the plaintiff for the recovery of the possession of the two islands or rocks mentioned in the record, containing, respectively, .14 of an acre and .01 of an acre, and designated on the official plat on file in the general land office, approved October 12, 1898, as lots 1

and 2 of section 11, township 2 S., range 5 W., Mt. Diablo meridian, Cal., and, as respects the remainder of the land sued for, that the plaintiff take nothing.