UNITED STATES of America, Plaintiff,

v.

NYE COUNTY, NEVADA,
et al., Defendants.

No. CV–S–95–232–LDG (RJJ).

United States District Court,
D. Nevada.

March 28, 1996.

Lois J. Schiffer, Peter D. Coppelman, K. Jack Haugrud, Caroline M. Zander, Allison B. Rumsey, Margo D. Miller, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, Kathryn Landreth, United States Attorney, Blaine T. Welsh, Assistant United States Attorney, Las Vegas, Nevada, for U.S.

Robert S. Beckett, Nye County District Attorney, Tonopah, NV, Roger J. Marzulla, Akim, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, for Nye County, Nevada.

## AMENDED ORDER

GEORGE, Chief Judge.

Plaintiff United States of America renews its motion for partial summary judgment (# 87) (Plaintiff's Renewed Motion) on Counts I and IV of its complaint. In its complaint, the United States alleges that it owns and has authority to manage certain public lands within Nye County. By statute, Defendant State of Nevada claimed ownership of this public land in 1979. In late 1993, Defendant Nye County passed Resolution 93–48, declaring that Nevada owns the disputed public lands in Nye County and that only the state and the county have authority to manage the land. At the same time, Nye County passed Resolution 93–49 asserting that, with limited exceptions, Nye County owns the rights-of-way for all roads and corridors crossing the public lands. Importantly, Nye County acted upon its denial that the United States owns and has authority to

manage the public lands. On July 4, 1994, Nye County reopened the Jefferson Canyon Road, straying from the right-of-way onto national forest land, ignoring an order of a forest service agent to stop. Following this action, a Nye County Commissioner filed an affidavit against the federal officer, stating that the officer lacked any jurisdiction. In Count I, the United States seeks a declaration that it owns and has authority to manage the disputed public lands within Nye County, Nevada. Pursuant to Count IV, the United States seeks a declaration that Resolution 93–49 is preempted to the extent it purports to apply to roads and corridors for which no valid right-of-way exists. As Nevada and Nye County have filed their oppositions (## 88, 94), this matter is submitted for consideration. The court also requested and received supplemental memoranda, and heard oral arguments.

This court has jurisdiction pursuant to 28 U.S.C. § 1345, as the United States is the plaintiff in this action. Venue is appropriate pursuant to 28 U.S.C. § 1391(b), as the claims arise from alleged actions taken or threatened within this District.

*Motion for Summary Judgment*

 Summary judgment disposes of those claims or defenses in which the moving party has shown (1) the absence of genuine issues as to the material facts, and (2) that the court may grant judgment as a matter of law. Fed.R.Civ.Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A material fact is one that affects the outcome of the litigation: a fact required to prove a basic element of a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir.1982). The lack of evidence supporting a fact essential to an element of a claim, or the submission of evidence precluding that fact, "necessarily renders all other facts immaterial." *Id.*, at 323, 106 S.Ct. at 2552. In determining whether a material fact is in genuine dispute, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

*Background*

On February 2, 1848, following the Mexican American War and pursuant to the Treaty of Guadalupe Hidalgo, 9 Stat. 922, Mexico ceded lands, including the area comprising present day Nevada, to the United States. On March 21, 1864, the United States Congress enacted the Nevada Enabling Act, 13 Stat. 30 (1864), authorizing a convention to draft a state constitution for ratification by the residents of the Nevada Territory. As a condition of statehood, the Nevada Enabling Act required that the convention adopt an ordinance agreeing and declaring that Nevada would "forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States." *Id.*, at § 4. In July 1864, the convention adopted the Nevada State Constitution and passed the Ordinance of the Constitution disclaiming all right and title to unappropriated public lands. The President of the United States, Abraham Lincoln, then proclaimed Nevada admitted to the Union on October 31, 1864. *See* 13 Stat. 749.

Presently, the United States asserts ownership of nearly 87% of the lands in Nevada. In Nye County, the United States' assertion of ownership increases to nearly 93% of the lands. These federal lands include portions of the Humboldt and Toiyabe National Forests (administered by the Forest Service, Department of Agriculture), a portion of the Death Valley National Monument, a large part of the Nellis Air Force Range (Department of Defense), most of the Nevada Test Site (Department of Energy), and the Ash Meadows National Wildlife Refuge. The remaining federal lands are public lands administered by the Bureau of Land Management, Department of the Interior, pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701. The FLPMA formally ended the policy of transferring federal lands to private ownership and adopted a policy of retention of these lands by the federal government.

In 1979, and in response to enactment of the FLPMA, Nevada enacted a series of statutes declaring ownership of and control and jurisdiction over all "public lands" within Nevada. Nev.Rev.Stat. §§ 321.596–321.599. As used in these statutes, "public lands" excludes land located in congressionally authorized national parks and monuments, national forests, wildlife refuges, lands acquired by the consent of the legislature, and lands controlled by the Department of Defense and the Department of Energy.

Nye County is a political subdivision of the State of Nevada, administered by an elected Board of Commissioners. Nye County has claimed that the United States does not own and that it lacks authority to manage public lands within its exterior boundary. See, June 7, 1994 Letter from Nye County Board of Commissioners, Exhibit C to Plaintiff's Renewed Motion. In claiming that the public lands belong to Nevada, however, Nye County asserts that Nevada owns more land than Nevada itself has claimed by statute. For example, while Nevada does not claim ownership of the national forests, Nye County has asserted that Nevada owns the lands managed by the Department of Agriculture, which manages the national forests. See ¶ 1 & 9 on Pages 2 and 4 of November 23, 1993 Letter From Richard Carver, incorporated by reference in Nye County Resolution 93–48, submitted as Exhibit A to Plaintiff's Renewed Motion. Rather, Nye County excludes, from the public lands, only the land ceded by Nevada to the federal government for post offices and federal buildings, and the land within the Nevada Test Site.[1] *Id.,* at pages 2–3 of the November 23, 1993 Letter From Richard Carver, Exhibit A; June 7, 1994 Letter from Nye County Board of Commissioners, Exhibit C to Plaintiff's Renewed Motion.

In addition to passing Resolution 93–48 declaring that Nevada owns all public lands, Nye County passed Resolution 93–49. This resolution declared that "all ways, pathways, trails, roads, country highways, and similar travel corridors across public lands in Nye County, Nevada, whether established and maintained by usage or mechanical means, whether passable by foot, beast of burden, carts or wagons, or motorized vehicles of each and every sort, whether currently passable or impassable, that was [sic] established in the past, present, or may be established in the future, on public lands in Nye County, are hereby declared Nye County Public Roads." The resolution further declared that "All rights of way ... across public lands that are declared Nye County Public Roads are the property of Nye County as trustee for public users thereof."[2]

In June 1994, Nye County, through Commissioner Richard Carver, the Vice–Chairman of the Nye County Board of Commissioners who acted with authority for and on behalf of Nye County,[3] declared that the Jefferson Canyon Road in the Toiyabe National Forest was a Nye County Public Road. June 9, 1994, Letter to Tonopah District Ranger David Grider, Exhibit D to Plaintiff's Renewed Motion. As the Jefferson Canyon road had been washed out in 1983, this letter further notified the district ranger that Nye County Board of Commissioners intended to reopen and maintain the road. On July 4, 1994, Commissioner Carver accomplished the intent of the Board by using a county-owned bulldozer to reopen the Jefferson Canyon Road. Significantly, the United States has offered uncontroverted evidence establishing that, in grading the road, Commissioner Carver strayed from any possible right-of-way onto national forest land.[4] After Commis-

---

1. It is unclear whether Nye County also claims Nevada owns the land within the Nellis Air Force Range.

2. Nye County excluded all roads across private lands, state highways 160, 361, 372, 373, 374, 375, 376, 377, 378, 379, and 844, and federal highways 6 and 95.

3. Nye County did not offer any evidence or argument suggesting that Commissioner Carver

lacked authority and was not acting on behalf of Nye County as to the actions taken by him that the court recounts in this decision.

4. At arguments March 7, 1996, counsel for Nye County asserted that the County did dispute whether Commissioner Carver left the right-of-way. However, the record does not support this assertion. The United States has submitted into the record the affidavits of David Grider and David Young. In his affidavit, Grider states that he was present at and witnessed the re-opening

sioner Carver strayed from the right-of-way, Forest Service Special Agent Dave Young stood directly in the path of the bulldozer and displayed a sign ordering the Commissioner to stop. Although Young continued to display the sign while the bulldozer was on national forest land, Commissioner Carver did not stop his activities. On July 6, 1994, Commissioner Carver filed an affidavit with the County Sheriff requesting criminal charges be brought against Young and another Forest Service employee. The Commissioner asserted that the Forest Service employees lacked any jurisdiction in Jefferson Canyon, which is clearly within the bounds of the Toiyabe National Forest. The County Sheriff forwarded the affidavit to the Nye County District Attorney, who has not yet acted upon the request for criminal prosecution.

In August 1994, Nye County informed the Bureau of Land Management by letter that the BLM could not enforce its Final Multiple Use Decisions for the Razorback and Montezuma Grazing Allotments because the BLM has not provided proof of ownership of the public lands or proof of constitutional jurisdiction. August 2, 1994, Letter from to Tonopah Resource Area Manager Ted Angle from Nye County Board of Commissioners, Exhibit F to Plaintiff's Renewed Motion.

In August 1994, Nye County, again acting through Commissioner Carver, informed the Forest Service that the San Juan and Cottonwood Canyon Roads, which were previously closed by the Forest Service and which are located in the Toiyabe National Forest, were Nye County Public Roads. August 22, 1994 Letter to Austin District Ranger Dayle Flanigan, Exhibit H to Plaintiff's Renewed Motion. In October 1994, the Nye County Board of Commissioners voted to reopen the San Juan and Cottonwood Canyon Roads. Exhibit I to Plaintiff's Renewed Motion. On October 15, Commissioner Carver again used

a county-owned equipment to reopen San Juan Road.

The United States brought this suit against Nye County. Following briefing and arguments on cross-motions for partial summary judgment as to Counts I and IV, this court required the parties to file supplemental briefs on the issue whether the State of Nevada asserts ownership of the public lands within Nye County. In response, the United States moved to amend its complaint to join Nevada as a Defendant. The court granted leave and permitted the parties to renew their motions for summary judgment, allowing Nevada to file briefs stating its position. The United States filed the renewed motion presently before the court, and Nye County and Nevada have filed oppositions. Nye County did not renew its cross-motion for summary judgment. This court requested and received supplemental memoranda and heard oral arguments.

*Ownership and Management of Public Lands*

### Case or Controversy

■■■■ In Count I, the United States seeks a declaration that it owns and has authority to manage the public lands in Nye County. Nye County argues that the United States has not alleged a case or controversy since Nye County has not claimed an adverse title to any public lands within Nye County and Nevada no longer claims title to the public lands. The argument fails for several, obvious reasons. First, Nevada concedes that, by statutes enacted in 1979, it claims ownership of some of the lands in question. Nevada's enactment of statutes claiming ownership is sufficient to create an adverse legal interest to the United States' assertion of ownership. *See United States v. Oregon,* 295 U.S. 1, 26, 55 S.Ct. 610, 620, 79 L.Ed. 1267 (1935). This is particularly true where, as in the present matter, a political subdivision of Nevada has relied upon that adverse legal

of the Jefferson County road. He further states that, in re-opening the road, Commissioner Carver operated the county bulldozer "obviously outside the original roadway." Likewise, Young witnessed the re-opening. He states in his affidavit that he ordered Commissioner Carver to stop his efforts only after the Commissioner "reached a point well up the hill from the stream

bottom which I believed was beyond any possible original road alignment." Although the United States filed the affidavits early in this litigation, in June 1995, Nye County has not offered any evidence or submitted any affidavits or declarations disputing this evidence that Commissioner Carver strayed from the Jefferson County road right-of-way in his efforts to re-open the road.

position to take actions opposing the United States' asserted title. While Nevada now concedes that its statutory claim is legally untenable, that concession does not moot the question of whether it claims ownership of the public lands. Rather, the concession is tantamount to a consent that judgment should be entered in favor of the United States. Thus, the United States has alleged a controversy concerning the validity of its claim of ownership.

Second, Nye County ignores that, in Count I, the United States seeks not only a declaration as to the ownership of the public lands, but also seeks a declaration whether the United States has the authority to manage the public lands. As Nye County recognizes in its opposition, a "controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Nye County's legal interest arises from its denial that the United States has any legal interest in managing the public lands. The United States claims and has acted as if it does have a legal interest in managing those lands. As these interests of Nye County and the United States are adverse, the United States has alleged a justiciable case.

Third, Nye County's argument mis-characterizes the United States' claim against Nye County as one seeking quiet title. Having reviewed the complaint and the undisputed actions of Nye County, the court finds that the claim is also analogous to an action in trespass. Rather than seeking damages as in a typical trespass action, the United States seeks a declaration that will preclude future trespasses in the context of Nye County's past trespass. Nye County's claim is that their legal interest in this property, that is, their interest in managing the property, results not only from the superior claim of the State to ownership of the public lands, but that the United States lacks any legal interest in the land that would limit or affect Nye County's authority to manage the land. Thus, Nye County's actions are valid only if the United States does not own or have authority to manage the public lands.

Finally, the parties have acted upon their alleged legal interests. Indeed, Nye County has challenged the United States' claim of ownership and jurisdiction to lands located within the national forests, lands to which even Nevada does not claim ownership. On July 4, 1994, Nye County reopened a road located within a national forest. As noted before, it is undisputed that, in reopening the road, Nye County strayed from the right-of-way and performed work on national forest land, disturbing the land and damaging the flora. An employee of the United States acted to stop Nye County from damaging the national forest land, ordering Nye County to stop its actions. Nye County has also challenged the jurisdiction of BLM over certain grazing allotments, threatening lawsuits for enforcement of federal action within those allotments. As Nye County acknowledges, the United States now seeks to resolve these challenges by establishing that it has a lawful claim of ownership to, and the authority to manage, the public lands. By considering the questions raised by Nye County's actions and entering a declaration, this court can resolve the disputed legal relationship of the parties to the extent of determining whether the United States owns and has authority to manage the lands. Accordingly, the United States has stated a justiciable case or controversy.

### Concrete Injury

■ Nye County next argues that the United States has failed to show that the controversy is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Lake Carriers' Assn. v. Mac-Mullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972). The argument is not well taken. On July 4, 1994, Nye County reopened the Jefferson Canyon Road. The United States has offered uncontroverted evidence that during the reopening of the Jefferson Canyon Road, Nye County disturbed land and damaged flora outside of the right-of-way and within national forest land. As Commissioner Carver stated during the October 4, 1994, meeting of the Nye County Board of Commissioners, the purpose of opening the Jefferson Canyon road was to require the United States to take Nye Coun-

ty to court. Throughout the record, Nye County has demonstrated that it will continue to refuse to acknowledge the United States claim of ownership, and to act upon that refusal. Indeed, Nye County's intent has been to intensify its dispute with the United States until the federal government sought judicial intervention. As Nye County has succeeded in its efforts, by the above actions, to create a justiciable controversy and a concrete injury, the United States can obtain judgment if warranted by the facts and the law.

### Ownership of the Public Lands within Nye County

The parties do not dispute that, prior to Nevada's statehood, the United States held title to the public lands within the territory that was to become Nevada. Nye County argues that it does not assert a claim of title to public lands, Nye County Opposition at 4, and thus its authority to manage public lands derives from and is limited to the claim of title by the State of Nevada. By statute, Nevada has claimed title to all public lands within Nevada, and thus within Nye County, excluding land located in congressionally authorized national parks and monuments, national forests, wildlife refuges, lands acquired by the consent of the legislature, and lands controlled by the Department of Defense and the Department of Energy. Nev.Rev.Stat. §§ 321.596–321.599. Although Nye County has claimed that Nevada also owns certain of these excluded lands, it has not offered any argument suggesting that Nevada has made that claim. Accordingly, there is no dispute that the United States owns the lands within the national parks and monuments, the national forests, the wildlife refuges, the lands acquired by the consent of the legislatures, and the lands controlled by the Department of Defense and the Department of Energy. The remaining question that this court must decide is whether title to the remaining public land within Nye County passed to Neva-

da. The court concludes that title did not pass to Nevada, but remains within the United States.

As noted earlier, while Nevada has statutorily claimed the public lands within Nye County, it now concedes that this claim is constitutionally untenable. While this concession is tantamount to a consent to judgment, the court also concludes that the statutory claim is unsupported, unconstitutional, and fails as a matter of law.

### Equal Footing Doctrine

 In claiming ownership of the public lands within its outer boundaries, the Nevada legislature asserted that title to the unappropriated lands passed from the federal to the state government under the equal footing doctrine. Nev.Rev.Stat. § 321.596(2). "The equal footing doctrine ensures that each state shares 'those attributes essential to its equality in dignity and power with other states.'" *Nevada v. Watkins,* 914 F.2d 1545, 1555 (9th Cir.1990). According to findings embodied in Nevada's statute, Nevada asserts that the original states obtained ownership of the unappropriated dry land as an attribute of their sovereignty at the time of the Revolution. Since Nevada was admitted on an equal footing to the original thirteen states, title to all unappropriated lands necessarily transferred from the federal to the state government as an attribute of local sovereignty.[5]

The Supreme Court has long recognized that certain types of property—specifically lands submerged by navigable or tidal waters—must pass to the states as a circumstance of sovereignty.

> Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty

---

5. The court notes that the reasoning of the Nevada legislature apparently requires a conclusion that Nevada gained title to all unappropriated lands. As noted, it also appears that Nevada claims title to only a portion of those lands. Given that Nevada's claims fail as a matter of

law, the court will not speculate whether Nevada could claim title to only a portion of the lands that were unappropriated at the time of statehood, or the effect such a partial claim would have on title to the remaining lands.

itself. For that reason, upon the admission of a state to the Union, the title of the United States to lands underlying navigable waters within the state passes to it, as incident to the transfer of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce.

*United States v. Oregon,* 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). The question before this court, however, is not whether the lands submerged by navigable waters passed to the states pursuant to the equal footing doctrine, but whether the dry lands also passed to the states pursuant to the equal footing doctrine.

In deciding this question, the court finds that *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988), provides excellent instruction. In that matter, the Supreme Court reaffirmed that lands submerged under tidal waters passed to the states as an attribute of sovereignty. More important to the present case, however, is the Court's recognition that the determination of which lands pass to the states derives from the Supreme Court's understanding and interpretation both as to English common law regarding royal ownership of public trust lands and the rights of the original states to those lands. *Id.,* at 478, 108 S.Ct. at 796. As such, it is the decisions and interpretations of the Supreme Court concerning the rights of the states to dry lands upon admission that are the appropriate guides to which this court must look. The actual state of the English common law at the time of the revolution, while instructive, is not controlling. Rather, this court is controlled by the Supreme Court's understanding and interpretation of that common law.

For example, in *Phillips,* the Supreme Court noted that it "has consistently *interpreted* the common law as providing that the lands beneath waters under tidal influence were given States upon their admission into the Union." *Id.,* (emphasis added). This tidal test for determining state ownership does not require navigability-in-fact. *Id.* In recognition of the thousands of miles of non-

tidal, navigable waters on the American continent, the Supreme Court extended the test for determining state ownership to include non-tidal waters that were navigable-in-fact. *Id.,* at 479, 108 S.Ct. at 798–97. "[T]his rule represents the American decision to depart from what *it understood* to be the English rule limiting Crown ownership to the soil under tidal waters." *Id.,* (emphasis added). Thus, states do not gain title to lands submerged by waters that are navigable-in-fact because the original thirteen states gained those lands at the time of the revolution. The original states could not have gained title to these lands as an attribute of sovereignty since this American rule was not developed until after the revolution. Instead, all states gained title to lands submerged by navigable waters because the Supreme Court decided that this was an appropriate extension of what it understood to be the English rule of sovereign rights to submerged lands.

Briefly looking to the Supreme Court's decisions indicates that it has held that tidal and navigable waters pass to the states because it understood that, under the English common law, the sovereign owned these lands as a public trust. This public trust doctrine was first developed in *Martin v. Waddell's Lessee,* 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842). Recognizing that the powers and attributes of sovereignty had vested in New Jersey, the court found that, "the people of New Jersey have exercised and enjoyed the rights of fishery for shell-fish and floating fish, *as a common* and undoubted right...." *Id.* 41 U.S. (16 Pet.) at 417 (emphasis added). Accordingly, the Court held that New Jersey, and each of the original thirteen states, gained "absolute right to all their navigable waters, and the soils under them *for their own common use,* subject only to the rights since surrendered by the Constitution." *Id.* at 410 (emphasis added).

The Court extended this holding to the new states in *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). At issue in *Pollard's Lessee* was whether, subsequent to Alabama's admission, the federal government could transfer title to lands that had been submerged by navigable waters at the time of statehood. Citing *Martin v.*

*Waddell's Lessee* for the proposition that the original thirteen states owned the submerged lands for common use in their character as sovereigns, the Court held that Alabama was also entitled to this attribute of sovereignty. *Id.,* 44 U.S. (3 How.) at 229. As this attribute of sovereignty, and its concomitant title to the submerged lands, transferred to the new states upon their admission, the federal government could not subsequently transfer the underlying title to the submerged lands. As in *Martin v. Waddell's Lessee,* the Court's conclusion arose from its interpretation of the public trust imposed on the sovereign, a trust requiring the sovereign to hold the navigable waters and submerged lands open for public access.

In sum, these cases identify a coherent principle set forth by the Supreme Court that this court must acknowledge. Specifically, the attribute of sovereignty that is so identified with title to submerged lands, the attribute of sovereignty. that passed to the original thirteen states, is the public trust to these lands. Not only were these lands to be held for the common good, but title to these lands resided in the sovereign so that the sovereign could ensure that the people continued to hold and have access to the lands. In contrast, the court is unaware of any Supreme Court decision holding that the original thirteen states gained title to the dry lands as a public trust, that is, to hold in common for all people. Rather, states could and did pass ownership of the unappropriated dry lands to private individuals to the exclusion of the people in common.

At least as important as this general principle underlying the Supreme Court's decisions, however, is that the Supreme Court has held that title to lands that are not submerged navigable-in-fact or tidal waters, including dry and fast lands, did not pass to the states upon admission. In addition to holding that "if the waters are not navigable in fact, the title of the United States to land underlying them remains unaffected by the creation of the new state," *United States v. Oregon,* 295 U.S. at 14, 55 S.Ct. at 615, the Supreme Court expressly held that title to dry lands does not pass to states upon admission in *Scott v. Lattig,* 227 U.S. 229, 33 S.Ct.

242, 57 L.Ed. 490 (1913). The facts of *Scott* closely parallel *Pollard's Lessee.* *Scott* was an action to quiet title to certain land in Idaho. As in *Pollard's Lessee,* the plaintiffs' claim of ownership in *Scott* required a finding that title to the land in question, specifically an island on the Idaho side of the Snake River, passed to Idaho upon statehood. If the title transferred to the state upon admission, state law would govern the disposal of the island just as it governed disposal of the bed of the navigable Snake River. Pursuant to state law, title to the island was a littoral right of the plaintiffs' ownership of properties on the shore of the river. And as in *Pollard's Lessee,* the defendant's claim of title required a finding that the title to the island remained in the federal government following statehood. The defendant asserted that, subsequent to Idaho's statehood, he had perfected title from the federal government to him under the federal homestead law.

Noting that the Snake River is navigable, the Supreme Court recognized that title to the bed of Snake River had passed to the state upon admission since "lands underlying navigable waters within the several states belong to the respective states in virtue of their sovereignty." *Id.,* at 242, 33 S.Ct. at 244. As such, Idaho law governed the question whether ownership of the shore lands included a right to the bed of the Snake River. The Court, however, rejected the notion that Idaho law also governed ownership of title to the island, instead finding that title remained in the federal government.

But the island, which we have seen was in existence when Idaho became a state, was not part of the stream or land under the water, and therefore its ownership did not pass to the state, or come within the disposing influence of its laws. On the contrary, although surrounded by the waters of the river and widely separated from the shore, it was fast dry land, and therefore remained the property of the United States and subject to disposal under its laws, as did the island which was in controversy in *Mission Rock Co. v. United States,* 48 C.C.A. 641, 109 Fed. 763, 769, 770, and *United States v. Mission Rock*

*Co.,* 189 U.S. 391, 47 L.Ed. 865, 23 Sup.Ct. Rep. 606.

*Id.,* at 244, 33 S.Ct. at 244.

It is, of course, beyond dispute that the dry lands within Nye County are further removed from navigable waters than the island at issue in *Scott.* As in *Scott,* the dry lands within Nye County are neither submerged by navigable nor tidal waters. Nye County has failed to offer any evidence suggesting that, at the time of statehood, the dry lands within Nye County were submerged by navigable or tidal waters. The Supreme Court has not held that the ownership of dry lands, or lands submerged by non-navigable and non-tidal waters, was an attribute of the original thirteen states' sovereignty. Rather, it has held that these lands do not pass to states upon admission. In sum, the entire weight of the Supreme Court's decisions requires a finding that title to the federal public lands within Nye County did not pass to the State of Nevada upon its admission pursuant to the equal footing doctrine.

**Lack of Constitutional Authority or Power to Own Lands**

Another legal theory upon which the Nevada legislature asserts ownership of public lands in its findings is that the federal government lacks either an express or necessarily implied power to retain public lands. *See* Nev.Rev.Stat. § 321.596(4) & (6). This theory was rejected by the Supreme Court, which has held that the Property Clause, Art IV, § 3 of the Constitution, vests such power in the federal Government. Elucidating upon the Property Clause, the Court has noted, "[t]he term territory, as here used, is merely descriptive of one kind of property; and is equivalent to the word lands. And Congress has the same power over it as over any other property belonging to the United States; and this power is vested in Congress without limitation...." *United States v. Gratiot,* 39 U.S. (14 Pet.) 526, 537, 10 L.Ed. 573 (1840). The Court then declined the invitation to construe the phrase 'dispose of,' to "vest in Congress the power only to sell, and not to lease such lands." *Id.,* 39 U.S. (14 Pet.) at 538. Rather, the Court continued, "[t]he disposal must be left to the discretion of Congress."

■ More recently, the Supreme Court reaffirmed the broad power of the federal government to retain and regulate public lands in *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In that matter, the Court stated that "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.'" *Id.,* at 539, 96 S.Ct. at 2291 (citing *United States v. San Francisco,* 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940)). Given this interpretation, the court must conclude that such a broad power to regulate land owned by the United States necessarily includes the power to own the regulated public lands.

*Authority to Manage the Public Lands*

Prior to this suit, Nye County denied that the United States had any authority to manage the public lands within its boundaries. *See* Nye County Resolution 93–48, Exhibit A to Plaintiff's Renewed Motion. All parties, including Nye County, now agree with the Supreme Court that

[a]bsent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

*Kleppe,* 426 U.S. at 543, 96 S.Ct. at 2293. *See* Plaintiff's Renewed Motion at p. 43; Nevada's Opposition at 12; Nye County's Opposition at 10.

■ Nye County argues, however, that merely recognizing that the local and federal governments have concurrent jurisdiction of public lands is virtually meaningless. The court would tend to agree but for Nye County's actions establishing that, prior to this suit, Nye County refused to acknowledge the holding of *Kleppe.* Those actions indicate that, as to Nye County, a declaration is required to establish that the federal govern-

ment has jurisdiction over the public lands. For example, Commissioner Carver, acting in his official capacity, filed an affidavit to support a criminal complaint against the forest service employees, alleging that they lacked any jurisdiction at a location within the boundaries of a congressionally-established national forest. On another occasion, the Nye County Board of Commissioners required the BLM to offer proof that the federal government owns and has authority to manage public lands. At the Jefferson Canyon road reopening, Commissioner Carver drove the county bulldozer outside of the right-of-way, damaging plant-life, disrupting the national forest, and ignoring the direct order of a federal employee to stop. That Nye County now voluntary concedes that the federal government has authority over this land is insufficient to moot a question created by Nye County's conduct, although the court will consider the concession as tantamount to a consent to judgment. Accordingly, a declaration that the federal government has power to manage and regulate the public lands within Nye County, just as it has power to regulate the public lands within New Mexico, will not be meaningless. Rather, it will resolve a dispute initiated by Nye County despite clear law to the contrary.

■ The court tends to agree with Nye County and Nevada that the present suit is not the appropriate vehicle to define the broad boundaries between local and federal jurisdiction over the public land in Nye County. Like the Supreme Court, this court will decline "to decide important questions regarding 'the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case,' or in the absence of 'an adequate and full-bodied record.'" *Kleppe*, 426 U.S. at 546, 96 S.Ct. at 2295 (citations omitted). This limitation, however, does not preclude this court from deciding the question raised by Nye County's actions. This suit did not arise over a dispute as to the relative line between federal and local jurisdiction, but arose because Nye County disputed the existence of any federal jurisdiction. Accordingly, this court's only determination is that absent consent or cession Nevada undoubtedly retains jurisdiction over federal lands within Nye

County, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

To the extent Nye County's remaining arguments—under the equal footing doctrine, the Guarantee Clause, and the transfer of core state functions—seek to define the constitutional boundary of jurisdiction over the public lands, the arguments are raised outside the context of an immediate and concrete case. To the extent Nye County raises these arguments to suggest that the federal government lacks any jurisdiction, the arguments are refuted by Nye County's own concession that such jurisdiction exists pursuant to the Property Clause. Accordingly, the court will not consider the remaining arguments and, to the extent set forth above, partial summary judgment is granted as to Count I.

*Constitutionality of Resolution 93–49*

■ In Count IV, the United States seeks a declaration that Nye County Resolution 93–49 is unconstitutional and preempted to the extent it applies to roads and other corridors for which no valid right-of-way exists under federal law. Nye County opposes the claim, asserting that Resolution 93–49 is nothing more than a statement of opinion by the Board of Commissioners of Nye County, creating neither legal rights, duties, nor obligations. As nothing more than a statement of opinion, the County asserts the resolution is protected speech under the First Amendment. The federal government counters that Nevada has recognized that counties can act by either ordinance or resolution, and that Nye County has acted by resolution in this instance.

Nye County concedes, and Nevada and amici Eureka and White Pine Counties concur, "that counties in Nevada can and do act or legislate by way of motions, orders, resolutions and ordinances." Nye County Supplemental Brief at 4. Nye County further concedes that Nevada has not made distinct the differences in "the legal effects of ordinances and resolutions." *Id.*, at 5. Never-

theless, Nye County urges this court to find that Nevada would distinguish resolutions as pertaining to administrative matters concerning specific actions while ordinances pertain to laws of general application.

The distinction urged by Nye County does not withstand scrutiny in light of Nevada statutory and case law. Nevada recognizes that counties can enact legislation of general applicability by resolution. " 'When a municipal council is given power to legislate in regard to a particular subject matter, and the statute is silent as to the mode in which the power shall be exercised, an enactment by the municipal council is valid whether it is in the form of an ordinance or resolution.' " *Blanding v. City of Las Vegas*, 52 Nev. 52, 75, 280 P. 644 (1929) (citations omitted). As to the decision to regulate by ordinance or resolution, "it is within the discretionary powers of the governing municipal board to balance [the] public and private interests against each other in determining the proper course and method of regulation." *Primm v. City of Reno*, 70 Nev. 7, 14, 252 P.2d 835 (1953). The Nevada legislature has identified, and the parties have pointed out, actions that counties may take only by ordinance and those that can be taken only by resolution. Nye County, however, has failed to identify any statute requiring that the action purportedly taken in Resolution 93–49 could be accomplished only by ordinance. Accordingly, it was within the discretion of Nye County to act by resolution rather than by ordinance as to Resolution 93–49.

Although Nye County now asserts that Resolution 93–49 created neither legal rights, duties nor obligations, Nye County plainly intended that the resolution would have the effect of law. As an attempt to formally express the opinion or will of the Board of Commissioners, the resolution offers only an example of poor writing. Other than its title, the resolution does not use any language suggesting it is an opinion, view, idea, or belief, but employs language attempting to create a legal right of Nye County in public roads. It declares all ways, trails, roads, and highways on public lands in Nye County to be Nye County Public Roads, declares the rights-of-way for these Nye County Public Roads to be the property of Nye County, requires that the width of all roads be as established by other ordinances, ratifies historic practice as a method of establishing roads, and precludes any action against Nye County or its officers for damage suffered on unmaintained roads. And other than the last sentence indicating an ordinance would follow, the resolution lacks any language of future intent or will.

Neither is the subject of the resolution simply an alteration of administrative rules, a censure, a vote of thanks, or a note of recognition, or an expression of intent to take future actions. Rather, the subject of Resolution 93–49 is one of general applicability, declaring County ownership of existing federally recognized rights-of-way and declaring County ownership of new rights-of-way that are not federally recognized.

In addition, Nye County has relied upon Resolution 93–49 in its chosen field of battle: the reopening of roads. On July 4, 1994, Commissioner Carver used a County-owned bulldozer to reopen Jefferson Canyon road within the national forest. A month prior to the reopening, Commissioner Carver, apparently on behalf of Nye County, informed the forest service: "As you know, on December 7, 1993 the Board adopted Resolution # 93–49 which declares certain public travel corridors across public lands within Nye County as Nye County roads. Jefferson Canyon Road is one of the roads considered to be a Nye County public road." [6] June 9, 1994, Letter to Tonopah District Ranger David Grider, Exhibit D to Plaintiff's Renewed Motion. This statement and Commissioner Carver's later actions to reopen the road on behalf of the County strongly show that the County did not intend Resolution 93–49 to be merely a statement of opinion.

Similarly, the County reopened San Juan Canyon road, also within a national forest, in October 1994. Commissioner Carver again used a County-owned bulldozer to accomplish

---

6. The court notes that Commissioner Carver also suggested that Jefferson Canyon road was an RS 2477 right-of-way. This suggestion, however, does not negate Commissioner Carver's reliance upon Resolution 93–49 as a source of law and as having created legal rights in Nye County.

the reopening. Prior to the reopening, on August 22, 1994, Commissioner Carver sent a letter to the forest service again indicating that both the San Juan and Cottonwood Canyon roads were "Nye County owned public roads in accordance with Nye County Resolution # 93–49." August 22, 1994 Letter to Austin District Ranger Dayle Flanigan, Exhibit H to Plaintiff's Renewed Motion. Again, this statement and the County's subsequent action in reopening the road show that County intended Resolution 93–49 to establish legal rights in the San Juan Canyon road, rather than simply state Nye County's opinion. Viewed as to the totality of circumstances, the court finds that Nye County did not pass Resolution 93–49 as a mere statement of opinion, but enacted the resolution as a law creating legal rights, obligations and duties.

Nye County further asserts that relief cannot be granted to the United States because the relief sought is over broad. Nye County argues that, pursuant to *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), this court cannot declare a valid enactment to be invalid merely because certain applications of the enactment may be invalid. Rather, the courts should determine the validity of the resolution as it is applied to particular cases as they arise.

In *Euclid,* the Supreme Court stated that "[t]he inclusion of a reasonable margin, to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity." *Id.,* at 388–389, 47 S.Ct. at 118. In the present matter, and contrary to Nye County's assertions, the United States is not seeking to place upon Resolution 93–49 a stamp of invalidity in its entirety. Rather, the United States seeks a declaration that the resolution is invalid only to the extent that it applies to roads for which no valid rights-of-way exist under federal law. The United States concedes that the resolution does not violate the Supremacy Clause to the extent it applies to roads for which a valid right-of-way exists under federal law. In addition, it is beyond reasonable dispute that the resolution's inclusion of roads for which no valid right-of-way exists is not a reasonable margin necessary to insure effective enforcement. At no time in this litigation has Nye County offered any argument that it can declare or establish rights-of-way across federal public lands that are not recognized by federal law without violating the Supremacy Clause. Neither has Nye County offered any argument that the obvious overbreadth of the inclusion of alleged rights-of-way was a reasonable margin to insure effective enforcement. Rather, only the federal government has offered argument concerning the validity of the resolution as it pertains to rights-of-way that are not recognized by the federal government. The United States has shown that it has enacted a comprehensive right-of-way regulation, generally allowing new rights-of-way to be granted only under Title V of the FLPMA. 43 U.S.C. §§ 1761–1771. In short, Resolution 93–49 does violate the Supremacy Clause to the extent that it applies to roads and other corridors for which no valid right-of-way exists under federal law. Therefore, for good cause shown,

IT IS **ORDERED** that Plaintiff United States of America's Renewed Motion for Summary Judgment (# 87) is GRANTED as to Count I and as to Count IV;

IT IS **DECLARED** that, as set forth in this Court's decision, the United States owns and has the power and authority to manage and administer the unappropriated public lands and National Forest System lands within Nye County, Nevada.

IT IS FURTHER **DECLARED** that Nye County Resolution 93–49 is invalid and unenforceable to the extent, and only to the extent, it applies to ways, pathways, trails, roads, county highways, and similar public travel corridors across public lands in Nye County, Nevada, for which no valid right-of-way exists or is recognized under federal law.